NATIONAL LABOR RELATIONS BOARD
v. ELECTRIC VACUUM CLEANER
CO., Inc.
No. 8748.

Circuit Court of Appeals, Sixth Circuit.
June 6, 1941.

612

Philip G. Phillips, of Cincinnati, Ohio (Robert B. Watts, Laurence A. Knapp, Ernest A. Gross, Bertram Edises, and Roman Beck, all of Washington, D. C., on the brief), for petitioner.

L. C. Spieth, of Cleveland, Ohio (Spieth, Taggart, Spring & Annat, of Cleveland, Ohio, on the brief), for respondent.

Joseph A. Padway, of Washington, D. C. (Joseph A. Padway, Herbert S. Thatcher, and Robert A. Wilson, all of Washington, D. C., on the brief), for intervenors.

Before SIMONS, ALLEN, and HAMILTON, Circuit Judges.

ALLEN, Circuit Judge.

This case arises upon petition for enforcement of an order of the National Labor Relations Board issued against the respondent corporation, which manufactures and sells electric vacuum cleaners in the United States and Canada. The interstate character of the business is not contested.

The Board found that the respondent had attempted to defeat the organization of its employees by the United Electrical and Radio Workers of America (hereinafter called the United), an organization affiliated with the Committee for Industrial Organization (hereinafter called the C. I. O.), and had rendered illegal assistance to a rival labor organization, the American Federation of Labor (hereinafter called the A. F. of L.).

The case arises out of the following facts:

In 1935 the Mechanics Educational Society, an unaffiliated union which had a substantial membership among respondent's production employees, called a strike for the purpose of securing a wage increase. During the strike, which lasted about ten weeks, the strikers called in representatives of the A. F. of L. for the purpose of negotiating a settlement and a bargaining contract. Before the contract was signed, the respondent demanded and received evidence that the A. F. of L. affiliates had been designated as bargaining agents for the majority of the employees, being presented with written authorizations to this effect signed by 608 out of a total of 799 employees. The authorizations were checked with the pay roll in order to test their authenticity. As a result, the respondent and certain locals of the Metal Polishers' Union, the International Association of Machinists, the International Molders' Union, the Pattern Makers Association of Cleveland and Vicinity, and the Federal Labor Union, all affiliated with the A. F. of L. and all parties herein, on June 22, 1935, entered into a written contract recognizing the unions named as the agents for their respective crafts for collective bargaining during the period of one year. An oral agreement was entered into at the same time. While there is some controversy as to the interpretation of this agreement, there is no dispute either as to its existence or its terms. It provided that in the future all new employees, after a probationary period of two weeks, should be compelled to join the appropriate craft union of the A. F. of L., but that the old employees, of whom some sixty-seven did not wish to join the A. F. of L., should not be compelled to do so. The respondent published notice of the contract throughout the plant and at the same time notified the employees that any one who did anything to disturb the peaceful and friendly relationship under the contract would be considered as working against the best interests of the company and subject to discharge.

Both the written and oral contracts were renewed for one year upon July 6, 1936. At that time 771 employees out of 809 were members of the A. F. of L., and had signed authorization slips designating the A. F. of L. as their bargaining agent "for one year and thereafter." A copy of a typical authorization is inserted in the margin.[1] During the life of the second contract, in March, 1937, a movement started among some of the old employees to organize a

[1] Authorization for Representation

I, the undersigned, employee of the Electric Vacuum Cleaner Co. employed as Assembler hereby authorize my (Craft—Mechanic, Helper or Apprentice) Craft Organization, affiliated with the American Federation of Labor,

Membership Fee

| | |
|---|---|
| Metal Polishers International Union | $3.50 |
| International Association of Machinists | 3.75 and $5.00 |
| International Molders Union of North America | 3.00 and 5.00 |
| Pattern Makers Association | 5.00 and 7.00 |
| Federal Labor Union | 2.50 |

to represent me and, in my behalf, to negotiate and conclude all agreements as to hours of labor, wages, and other employment conditions. I also authorize the Company to deduct, within thirty days, from wages due, the prevailing initiation or reinstatement fee of the organization as indicated hereon and transmit same to the authorized representative of the organization.

The full power and authority to act for the undersigned as described herein supersedes any power or authority heretofore given to any person or organization to represent me, and shall remain in full force and effect for one year from date and thereafter, subject to thirty (30) days written notice of my desire to withdraw such power and authority to act for me in the matters referred to herein.

Signature of employee
(Union Label)

C. I. O. union in the plant. Some sixty employees met with an organizer of the United, signed application cards for membership therein, and solicited memberships actively throughout the plant. In connection with this agitation for the C. I. O., the representatives of the A. F. of L., who under the contract had been permitted to enter the plant and to sign up employees for union membership, endeavored to secure the signatures of some of the old men. Edward Ramsey, one of the old employees, was asked to join the A. F. of L. Upon his refusal, a representative of the Cleveland Federation of Labor, in the presence of Paulus, respondent's superintendent, told Ramsey he was fired, and Paulus notified Ramsey's foreman of that fact. Other men were asked to join the A. F. of L. in the presence of Paulus or of certain of respondent's officials. After Ramsey's discharge a sit-down strike was started by the men who had signed the C. I. O. applications, and from the afternoon of Thursday, March 18, 1937, to the morning of Friday, March 19th, some ninety employees participated in a sit-down strike in the machine shop. At the request of the representatives of the A. F. of L. the respondent closed the plant from March 20th until April 5th, and between those days a new contract was negotiated with the affiliates of the A. F. of L., which provided for a closed shop, and membership of all employees without exception in the craft unions of the A. F. of L. When the plant reopened the men were required to present A. F. of L. clearance cards in order to secure re-employment. 910 of the 1032 employees signed a written approval of the closed shop contract, and at the time of the trial before the examiner, 964 had signed such approval slips.

The Board directed the respondent to cease giving effect to the closed shop clause of its contract with the A. F. of L., dated May 20, 1937, and to cease giving effect to any provision of that contract if and when the Board should certify another labor organization as the exclusive collective bargaining representative of respondent's employees. It ordered respondent to pay back wages to 24 employees against whom it found that discrimination had been practiced, to reinstate 22 of them, and to post the usual notices. Nineteen of the 24 were old employees, 18 of whom were members of the A. F. of L.

Respondent agrees that in absence of the contracts of 1935, 1936, and 1937, the discharges and the shut down of the plant were discriminatory, and this view is clearly correct. Phelps Dodge Corp. v. National Labor Relations Board, 312 U.S. ——, 61 S.Ct. 845, 85 L.Ed. ——, decided April 28, 1941; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Link Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. But it contends that it made a valid agreement with the affiliates of the A. F. of L., specifically authorized under § 8(3) of the statute, which was consummated with unions not established, maintained or assisted by the respondent; that whatever acts were done by the respondent were under the contract and in furtherance thereof, and that it is not a violation of the National Labor Relations Act (49 Stat. 449, 29 U.S.C.A. § 151 et seq.) to discharge employees for interference with a valid union contract.

The pertinent portions of the statute read as follows:

"Sec. 7 [§ 157]. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

"Sec. 8 [§ 158]. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title].

\* \* \* \* \*

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act [chapter], or in the National Industrial Recovery Act (U.S.C., Sup. VII, title 15, secs. 701-712 [15 U.S.C.A. secs. 701 to 712]), as amended from time to time, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act [chapter] as an unfair labor prac-

tice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9(a) [159(a) of this title], in the appropriate collective bargaining unit covered by such agreement when made."

Clearly the proviso of § 8(3) validates certain action which would otherwise constitute illegal discrimination under the Act. If the proviso had not been enacted, no employer, under the statute, could refuse to hire an applicant for work because of his membership or non-membership in any labor organization (Phelps Dodge Corp. v. National Labor Relations Board, supra), nor require him to join any specific organization before employing him, as may legally be done pursuant to a contract executed in accordance with the proviso.

The Board decided that prior to March, 1937, the respondent was entitled to require new employees to join the A. F. of L. affiliates, finding that the agreements both of 1935 and 1936 were executed when the A. F. of L. affiliates represented a majority of the employees and had not been assisted by any unfair labor practice on the part of the respondent. It considered, however, that these contracts did not and could not limit the right of old employees to join the United and to induce other employees, whether or not members of the A. F. of L., to abandon membership in the A. F. of L. for membership in the C. I. O., and therefore decided that the shut down of the plant at the request of the A. F. of L. was an unlawful act of assistance, and that the acts and negotiations in connection with the reopening of the plant and the requirement of membership cards in the A. F. of L. for reemployment constituted illegal discrimination. It concluded that the proviso of § 8(3) does not permit imposition of the penalty of discharge in a case where no notice of the existence of the agreement has been given, and found as a fact that no notice of the agreement had been given to the new employees. It decided that the closed shop contract of May, 1937, was invalid because the A. F. of L. had been assisted by the respondent through unfair labor practices in violation of the statute.

■ The legal conclusion made by the Board that the members of the A. F. of L., after the 1935 and 1936 contracts were executed, were free to abandon such membership at will, when considered in the light of the authorizations signed by the men and the total failure to file withdrawals in accordance therewith, is plainly erroneous. So far as the understanding of the parties illuminates the meaning of the obligation, it is that the men were bound for the period defined in the authorizations. There was no testimony to the contrary.

■ In order to reach its conclusions, the Board ignored the fact that the contract of 1936, found by it to be valid under the statute, granted recognition as exclusive collective bargaining agent to the A. F. of L. and required its members to maintain and perform the contract for one year. It was an implied term of the contract that every member of the organization would cooperate in the enforcement of the agreement made between respondent and the A. F. of L. affiliates which he had expressly authorized to represent him in these matters, and would not take action looking toward the violation of the contract. The C. I. O. agitation, the sit-down strike, the closing of the plant, and the making of the closed shop agreement of May, 1937, all occurred before this year had expired.

■ There is no question as to the existence of the contracts of 1935 and 1936. As found by the Board each of them was made with a labor organization not established, maintained or assisted by any unfair labor practice, and representing an uncoerced majority of the employees. Each of these contracts required as a condition of employment membership in the A. F. of L. with reference to all men subsequently employed, and thus falls squarely within and is validated by the statute. It is immaterial whether the men considered the contract as establishing a closed shop or a preferential shop. The contracts were in the nature of closed shop agreements, for eventually, as old men dropped out, if the contracts were renewed a genuine closed shop would be established.

■ The mandate of the proviso is not limited to the usual closed shop; it does not require that the condition of membership in the union contracted with should attach to men previously employed as well as to those employed in the future. Nor does it prohibit mutual assistance and cooperation between the parties to such contract unless such assistance amounts to an unfair labor practice. The express purpose of the statute was the establishment of industrial peace, and the proviso was enacted to give the employer the opportunity of dealing in an orderly fashion with

one organization only, instead of with various conflicting organizations. In order to carry out its purpose, obviously both contracting parties are compelled to perform their obligations thereunder. The Congress would not have specifically authorized a contract of this nature unless it had intended that both parties should be bound thereby. If the men agree to operate under the contract for a certain period they are legally bound, in absence of wrong-doing by the employer, not to abrogate the contract except in accordance with its terms. If the one-year term limits the freedom of the employees at will to discard membership in one union for membership in another, the limitation has been freely agreed to by the men themselves, and the right of organization with representatives of their own choosing is curtailed not by the employer, but by their own valid agreement.

█ In the instant case it was reasonable that these men should agree to exempt from the requirement of union membership the older men whose unwillingness to join the A. F. of L. was preventing the settlement of the strike initiated by the Mechanics Educational Society, and the exemption in no way affects the legality of the agreement. The contract of May, 1937, providing for a closed shop, was negotiated during the existence of the valid contract of 1936 by the representatives designated therein; and if the transactions leading up to the closed shop contract were justified by respondent's efforts to maintain the valid contract of 1936, then the closed shop agreement is lawful and no finding of unfair labor practices is justified. Unquestionably the respondent assisted the A. F. of L. from March, 1937, to May, 1937, and the controlling question is whether this assistance was illegal.

█ At the time that some of the old employees called a C. I. O. organizer into the plant, all but 38 of the employees working when the 1936 contract was executed had signed written authorizations, as hereinbefore described. These authorizations, running for a term of one year and thereafter, could be withdrawn upon thirty days' written notice; but the record presents no such withdrawal. The term of one year was reasonable and the authorizations were in every respect legal. Signing the authorizations entitled the men to the benefits of union membership, including the benefits of the contract between the re-

spondent and the affiliated unions, and they in turn were bound thereby during the term of the authorizations. They were both ethically and legally bound not to disrupt the contract. It follows that any employees who were members of the A. F. of L., whether old or new men, violated the contract when they tried to bring in a rival union, and became rightfully subject to discharge. The National Labor Relations Act does not prohibit an effective discharge for repudiation by the employee of his agreement. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 344, 59 S. Ct. 508, 83 L.Ed. 682. The Board, therefore erred as to its order finding the respondent guilty of discrimination with reference to 18 of the 24 employees named in the order because these 18 were members of A. F. of L. affiliates, were bound by the contract until June, 1937, and were compelled to be in good union standing in order to continue in respondent's employ.

█ The new men who were required under the valid union contract to join the A. F. of L. also had no right to aid in disrupting the relations established thereby. The requirement, agreed upon through negotiations by the collective bargaining representatives of a clear majority, that all the men present A. F. of L. clearance papers after the plant was reopened, was reasonable and not unlawful.

Ramsey was the only man found to have been discharged for failure to join the A. F. of L. He was returned to work when the plant reopened on April 5th, after the sit-down strike, and has been with the company ever since. The Board did not order any payment to Ramsey for loss of wages. He suffered no loss of time except during the time that the plant was shut down.

█ We differ from the Board as to its construction of the statute with reference to notice. Knowledge of the terms of the agreement was received by the representatives who negotiated the contracts while acting within the scope of their authority, and it is elementary that such notice to the unions was notice at least to all but 38 of the men when the contract was signed in June, 1936. In view of the provision of § 9(a), 29 U.S.C.A. § 159(a), that the organization chosen by the majority shall be the exclusive representative of "all the employees" in the appropriate unit for the purpose of collective bargaining, we think that notice to the affiliates was notice

to every employee under the statute. The proviso does not require as a condition to the validity of a restrictive contract made thereunder that notice of the existence of the contract must be given at the time of employment, nor that the employer must give notice. It is uncontradicted on this record that new employees were to be given two weeks' probation, and, if their work was satisfactory, they were then required to join the union. This arrangement was reasonable and in no way illegal. It is also uncontradicted that it was the duty of the appropriate craft union to solicit men for membership. The duty of notice in no case rested upon the respondent. Before the controversy arose and while the contract of 1935 was in effect, the respondent gave the union representatives access to the plant for the purpose of carrying out their obligations. In a few cases, where new men employed stated that they had no notice of the requirement, the union had merely failed to perform its function of signing them up. This dereliction cannot rightly be charged to the respondent.

■ It follows that the closed shop agreement of May, 1937, was valid under § 8(3), for the acts of respondent in closing the plant, discharging the agitators, and in endeavoring otherwise to maintain the lawful contract of 1936 were not unfair labor practices. The Board erred in holding that members of the A. F. of L., whether new or old employees, who were not recalled because of their interference with the contract, were discriminated against in violation of the statute.

The Board contends that all of the acts of the respondent subsequent to March, 1937, were illegal acts of assistance of the A. F. of L. within the scope of the decision in International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. ——. We think that this case is squarely differentiated from the instant case upon the facts. In the cited case, the employer had repeatedly expressed violent hostility to the C. I. O.; in violation of the Act it had maintained a company union, and the same organizers among its employees who had established the company union used pressure upon employees to join the A. F. of L. In the instant case, not the slightest preference toward any union whatever is shown on the part of the respondent until after the signing of the valid contract of 1936, which represented the choice of eighty-five per

cent of respondent's employees. The International Machinists case does not hold that an employer who has made a valid contract with a union, looking toward a closed shop, may not take action, pursuant to negotiations with the exclusive bargaining representatives under the Act, which may prevent the entrance of a rival union into its plant and the consequent disruption of industrial peace. Section 8(3) was enacted to obviate this very situation. It validates acts which in the absence of such a contract would be illegal under the statute, and it validates them in order that the employer may protect itself from ruinous inter-union controversy. The shut down of the plant, failure to recall certain employees, and the making of the closed shop agreement were all in furtherance of the valid contracts previously entered into, and the Board erred in finding the respondent guilty of discrimination and violation of the statute.

The order is set aside, and the petition to enforce is dismissed.