NATIONAL LABOR RELATIONS BOARD *v.* ELECTRIC VACUUM CLEANER CO., INC., ET AL.

No. 588. Argued March 5, 1942.—Decided March 30, 1942.

Mr. *Robert B. Watts,* with whom *Solicitor General Fahy* and Messrs. *Richard S. Salant, Ernest A. Gross,* and *Morris P. Glushien* were on the brief, for petitioner.

Mr. *Lawrence C. Spieth* for the Electric Vacuum Cleaner Co., Inc., and Mr. *Herbert S. Thatcher,* with

whom *Mr. Joseph A. Padway* was on the brief, for the International Molders' Union, Local 430, et al., respondents.

MR. JUSTICE REED delivered the opinion of the Court.

The basic question for determination by this review is the right of the respondent employer, the Electric Vacuum Cleaner Company, Inc., to coöperate with unions, representing an uncoerced majority of its employees, to secure new members. The right is challenged because exercised prior to a closed shop agreement.

The other respondents are various unions, all affiliated with the American Federation of Labor, which we shall call the Affiliates. Since June 22, 1935, these unions have been recognized by the employer as the duly chosen agents of the employees for collective bargaining. On that date, the Affiliates and the employer entered into a written contract covering hours and working conditions for the period ending June 23, 1936. A similar contract extended the arrangements to June 23, 1937. In making the latter contract, the Affiliates satisfied the employer of their right to represent the workers, by exhibiting authorization cards totaling 771 out of the 809 employees affected. These cards gave the Affiliates "full power and authority" to conclude for the signer "all agreements as to hours of labor, wages and other employment conditions." They were to "remain in full force and effect for one year from date and thereafter, subject to thirty (30) days written notice of my desire to withdraw such power and authority to act for me in the matters referred to herein." We assume that the cancellation clause is ineffective prior to twelve months from the date of the card and that all cards were dated just prior to the termination of the first, or 1935, contract.

In March 1937, when the contract and the individual powers of attorney still had several months to run, the

United Electrical and Radio Workers of America (hereafter called United), affiliated with the Committee for Industrial Organization, began an effort to organize the plant. The Board, on adequate evidence, found that about sixty employees immediately signed United cards, that on March 19th a meeting of United was held at the Post Office building in East Cleveland, attended by a "large number of employees," and that on March 28th another United meeting was held "by a large number of persons, for the purpose of securing formal resignations from the A. F. of L. Affiliates." It is undisputed that a United charter was issued to the interested employees for a Local 720, and that on April 2nd the Local notified the employer by letter that a majority of its employees had resigned their memberships in the Affiliates and had "affiliated" themselves with United. Local 720 claimed in the letter the right to negotiate grievances "under the existing contract," i. e., that expiring June 23, 1937. This letter was not received by the employer until April 5th.

Prior to the receipt of this letter, and during a shutdown of the plant by the employer, which had begun on Monday, March 22, 1937, pursuant to a request of the Affiliates, dated March 20th, the employer and the Affiliates had entered into an oral arrangement on Saturday, April 3rd, pursuant to which the employer notified its employees it was reopening its plant Monday, April 5th, under the contract expiring the subsequent June 23rd, and added "but only those employees who are members of the crafts under contract with us will be employed." Eventually, a closed shop clause appeared in a bilateral written contract, superseding the one expiring June 23rd, executed as of May 20, 1937, in the following form:

Article III (d) "The Employer agrees to employ only members of the Unions in good standing in their respective Unions, and should the Employer require more employees

than those now employed, the Employer will secure such employees through the Unions, if however, the Unions are unable to furnish such employees, the Employer may secure them elsewhere, it being understood, however, that such employees so secured shall become members of the Union."

On the reopening of the plant, no one was permitted to return to work who did not present a clearance card from the Affiliates. The refusal of the company to reëmploy certain members of United Local 720 gave rise to charges of unfair labor practices, which were sustained by the National Labor Relations Board. 18 N. L. R. B. 591. The employer was ordered to cease and desist from discouraging membership in United and encouraging membership in the Affiliates; from giving any effect at any time to paragraph (d) of Article III of the May 20, 1937, agreement, quoted above, requiring a closed shop; from giving any effect to the remainder of the May 20, 1937, agreement upon certification of any other labor organization than the Affiliates as exclusive collective bargaining representative, and from in any manner interfering with its employees' rights to self-organization. The order required affirmative action by the employer, for certain employees, to the extent of reinstatement and back pay, with the usual provisions for posting notices of compliance and notification of the Board. Some other charges, and a petition for investigation and certification of bargaining representatives, were dismissed without prejudice.[1]

The respondents successfully contested an enforcement petition. The Circuit Court of Appeals set aside the order, 120 F. 2d 611, on the ground that the refusal to permit

---

[1] Certain clauses of the order relating to reimbursement of federal, state and local work-relief projects are abandoned by the Board and should be eliminated. *Republic Steel Corp.* v. *Labor Board,* 311 U. S. 7.

members of the United to resume their work was justified because, at the time, a valid closed shop contract, in favor of the Affiliates, under § 8 (3) of the statute, set out below, was in effect.[2] Deeming the issues important in the administration of the Act, we granted certiorari. 314 U. S. 600.

In addition to the facts just stated, the Board found there was an oral provision, pertaining to a closed shop, included in the 1935 and 1936 contracts. This was to the effect, the Board concluded, that all employees hired after the date of the first contract (referred to as new employees) should be required, after a work-probation period of two weeks, to become members of the appropriate Affiliate union. Respondents contend the oral addition was somewhat different, and that, under it, not only were new employees compelled to join the Affiliates, but old employees (those employed before the first contract) who were, or who became, members of the Affiliates were required to maintain their membership unimpaired. Respondents' position was upheld by the Circuit Court of Appeals for this and other reasons. The freedom of old employees, under the earlier contracts, to join or not, as they wished, is acknowledged by all.

---

[2] 49 Stat. 452, c. 372, § 8: "It shall be an unfair labor practice for an employer— . . . (3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, or . . . any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made." 29 U. S. C. § 158 (3).

The Court relied heavily upon the authorizations to bargain,[8] furnished the Affiliates by the old employees, as indicating the old employees who were members must maintain that status until the year was up. Assuming that every old employee furnished a power of representation for collective bargaining not revocable during the year, it need not be inferred the employee also was bound thereby not to switch his union allegiance. If the employee were forced to await the expiration of the year before changing membership, the first bargaining representative might have a contract for the ensuing year executed before a new representative could be organized and empowered to act. There is nothing in this record to compel such interpretation of the authorizations. With respect to the contract between the employer and the Affiliates, the Board cites the evidence of several, including a letter from the employer's president, written before any controversy arose, to the effect that the oral provision was that new employees must join the Affiliates. From this evidence, the Board was fully justified in reaching its determination that nothing more was agreed. *Labor Board* v. *Automotive Maintenance Mach. Co.*, 315 U. S. 282; *Labor Board* v. *Falk Corp.*, 308 U. S. 453, 461; *Labor Board* v. *Greyhound Lines,* 303 U. S. 261, 271. There is a difference between being bound to retain the same bargaining representative

---

[8] "I, the undersigned, . . . hereby authorize my Craft Organization . . . to represent me and, in my behalf, to negotiate and conclude all agreements as to hours of labor, wages and other employment conditions. . . .

"The full power and authority to act for the undersigned as described herein supersedes any power or authority heretofore given to any person or organization to represent me, and shall remain in full force and effect for one year from date and thereafter, subject to thirty (30) days written notice of my desire to withdraw such power and authority to act for me in the matters referred to herein."

for a specified period, and being bound not to become a member of a different union during the term of the contract. The first situation, not the second, arose from the earlier contracts.

The commencement of the United campaign for membership, in March, brought coöperative action between the employer and the Affiliates to strengthen the latter's position. Under the oral contract, as defined by the ruling of the Board, now approved here, new employees could properly be required to become members of the Affiliates, but old employees could neither be required to become members nor to maintain their membership. The Board found that, to forestall defections of old employees from the Affiliates to the United, the employer "summoned old employees to the office and there sought to, and in many instances was able to, coerce them into joining the A. F. of L. Affiliates." In the office were representatives of the Affiliates as well as the employer. A number of old men were called before this group. It is not clear from the record which ones had been members of the Affiliates and lost their standing, or which ones had never been members. There were instances of each type. Vitosky had been a member. Ramsey had not. Both Vitosky and Ramsey were old employees, each in service long prior to the first contract. Vitosky and four others signed affiliate cards on demand, and returned to work. Ramsey refused to sign, and was discharged. Upon the report of Ramsey's discharge reaching the workshops, there was a one day sit-down strike. Respondents urge that Ramsey's discharge was the result of an error. This issue need not be resolved, as there is evidence that some old men, in violation of the collective bargaining agreement, were required to maintain or renew their membership in the Affiliates prior to the closed shop agreement of April 3rd. Such facts are adequate to support the Board's ruling of coercion of em-

ployees by the employer in order to maintain the membership of the Affiliates. Without a closed shop contract covering the employees involved, this company effort to maintain a union violates provisions protecting the freedom of employees to organize as they may wish. 49 Stat. 452, §§ 7, 8 (1), 8 (3); 29 U. S. C. §§ 157, 158 (1), 158 (3).

Furthermore, upon the adjustment of this sit-down strike, which took place Friday, March 19th, after the occurrences just described, the Affiliates requested, and the employer ordered, a shutdown of the entire plant, which lasted from March 22nd to April 5th. The Board found that this shutdown was for the purpose of preventing "further proselyting" among members of the Affiliates by the United. A vice-president of the employer testified to such facts, learned by him in conference with officials of the Affiliates who stated they needed the time to "get their lines in order." Assistance to a union by a shutdown, like any other employer assistance, is forbidden.[4]

Respondents assert that whatever employer assistance was rendered the Affiliates was justified, even under an interpretation of the contract which restricts the oral portion to a requirement that new members join the Affiliates. The assistance, it is urged, was rendered to collective-bargaining representatives, selected freely by a majority of the employees and possessed of unrestricted and unrevoked powers to negotiate generally over labor conditions, including the closed shop clause of April 3rd and the new closed shop contract of May 20, 1937. Under this view, since the discharges took place after a valid closed shop amendment, they were in conformity with § 8 (3) of the Labor Act.

---

[4] *Labor Board* v. *Lund,* 103 F. 2d 815; *Labor Board* v. *National Motor Bearing Co.,* 105 F. 2d 652.

694

An examination of the proviso of § 8 (3) will demonstrate the error of this position. That proviso reads, so far as pertinent, as follows:

*"Provided,* That nothing in this Act . . . shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made."

Under the findings already sustained, the Affiliates were assisted and maintained by the coöperation of the employer in dealing with the old employees. Such acts encouraged the labor organization, in violation of the portion of § 8 (3) preceding the proviso, set out in note 2. Consequently, when the closed shop agreement was adopted, April 3rd, it was invalid because entered into with a labor organization assisted by an employer, in the precise words of § 8 (3) quoted above. Cf. *I. A. of M.* v. *Labor Board,* 311 U. S. 72, 81. Being invalid, the discharges violated §§ 7, 8 (1) and (3).

Respondents, however, take the position that the Congressional purpose embodied in the Labor Act is not served by such literalness. As they see the situation, freedom to organize must necessarily be qualified after uncoerced employees obtain validly chosen majority representatives. Previously untrammeled rights, they argue, must be subjected to the modicum of interference here practiced, in order that the Congressional object of industrial peace may be realized. We think, however, that the Board's interpretation of the applicable language is correct. The provision for a closed shop, as permitted by § 8

(3), follows grammatically a prohibition of discrimination in hiring. These words of the exception must have been carefully chosen to express the precise nature and limits of permissible employer activity in union organization. To permit employer interference prior to the execution of a closed shop contract, as soon as a bare majority of employees had properly selected their representatives, would go far to restore the type of company-union coördination in labor matters which the act forbids.[5]

Since we have held that assistance was given the Affiliates by the unfair labor practice of encouraging membership in those unions, it follows that the closed shop agreement of April 3rd, requiring old employees to be members of the Affiliates, was made with an assisted labor organization and could be held invalid. *I. A. of M.* v. *Labor Board,* 311 U. S. 72, 75. How long that invalidity continues is an inference of fact for the fair determination of the Board. Cf. *H. J. Heinz Co.* v. *Labor Board,* 311 U. S. 514, 522. Consequently, the refusal of the employer to permit the employees to work without clearance from the Affiliates could be found a forbidden interference and discrimination. § 8 (1) and (3). *Labor Board* v. *Link-Belt Co.,* 311 U. S. 584, 601. Further, the Board's conclusion that the infirmities of the April 3rd arrangement were destructive of the May 20th contract proceeds naturally from its decision as to the effect of the employer activities prior to April 3rd. The force of the unfair practices was not necessarily dissipated so quickly.

---

[5] There is an illuminating comment in the Senate Report on the Labor Bill. S. Rep. 573, 74th Cong., 1st Sess., p. 12:

"The assertion that the bill favors the closed shop is particularly misleading in view of the fact that the proviso in two respects actually narrows the now existent law regarding closed-shop agreements. While today an employer may negotiate such an agreement even with a minority union, the bill provides that an employer shall be allowed

The employer calls our attention to provisions of the order reinstating employees, which it feels erroneous. So far as this objection is based on an interpretation of the 1936 oral contract to require old employees to maintain their membership, it is answered by prior portions of this opinion. The employer's refusal to admit these old employees to work on and after April 5th is properly remedied by reinstating them in their position and granting them back pay.

There is a different basis, however, for the objection to the reinstatement of the new employees. This is that, under any interpretation of the oral clause of the 1936 contract, these men must become members of the Affiliates, and therefore the employer's refusal to take them back on their jobs is proper, even though the April 3rd arrangement is invalid. The Board answers that the April 3rd arrangement was an abandonment of the earlier oral clause, and that, consequently, the discharges made pursuant to the later invalid closed shop arrangements are improper. The abandonment, the Board finds, was intentional, and therefore the subsequent invalidation of the later arrangement did not revive the vitality of the earlier oral contract.

This finding of abandonment of the 1936 membership clause was an inference drawn by the Board from the circumstances surrounding the adoption of the April 3rd arrangement. It is an inference the Board is entitled to

---

to make a closed-shop contract only with a labor organization that represents the majority of employees in the appropriate collective-bargaining unit covered by such agreement when made.

"Secondly, the bill is extremely careful to forestall the making of closed-shop agreements with organizations that have been 'established, maintained, or assisted' by any action defined in the bill as an unfair labor practice. And of course it is clear that no agreement heretofore made could give validity to the practices herein prohibited by section 8."

make when supported by material evidence. To the Board, the Congress has entrusted the appraisal of the evidence and the drawing of such inferences. 49 Stat. 454, § 10 (e); *Labor Board* v. *Waterman S. S. Co.*, 309 U. S. 206, 209; *Labor Board* v. *Link-Belt Co.*, 311 U. S. 584, 597. The lack of positive evidence of the abandonment is natural. It was found abandoned by the Board because of the actions of the parties, the employer and the Affiliates, looking to the creation of a new, all embracing closed shop contract. While the Board found the 1936 oral clause had covered only new employees, the Affiliates issued a notice to their members, dated March 31st, saying the "solution to the problem [i. e., "the situation that resulted in the closing of the plant"] is proper enforcement of the present agreement, and that no one be allowed to resume work unless affiliated with these organizations." On April 3, 1937, the employer notified its employees that in 1936 "it was agreed that we employ only persons affiliated with said crafts" (the Affiliates). Such interpretation of the old clause, varying so radically from that adopted by the Board, is not conducive to clear-cut evidence of the purpose of the substitute closed shop arrangement of April 3rd. Considered against the background of coercion of old employees, the strike difficulties and the closing of the plant, all affected at least by the United's membership campaign, we are not willing to say that the Board's finding that "In substance, though not in form, the arrangement effected between the respondent and the A. F. of L. Affiliates on or about April 3, 1937, was an abandonment of the oral agreement as insufficient to meet the exigencies of the situation and its replacement by a closed-shop agreement," is unsupported by substantial evidence.

We have noted the employer's objection to the burden of back pay placed upon it because of the Board's alleged

delay in entering the final order.  Handling of complaints as quickly as is consistent with good administration is of course essential.  It is important both to the employer, who may have to pay back wages, and to the employee, who must live without his job.  Unfortunately, this cause took from June 10, 1937, to December 31, 1939.  There is nothing in the record, beyond a failure of the Board to file an intermediate report, which would tend to justify us, however, in shortening the period for compensation.  This error was admitted and corrected by the Board.  We cannot penalize the employees for this happening.

The judgment of the Circuit Court of Appeals is reversed with directions to enforce the order of the Board except as to reimbursement of federal, state and local work-relief projects.

*Reversed.*

MR. JUSTICE ROBERTS is of the opinion the judgment should be affirmed for the reasons stated in the opinion of the Circuit Court of Appeals.  120 F. 2d 611.