NATIONAL LABOR RELATIONS BOARD
v. McGOUGH BAKERIES
CORPORATION.

No. 11412.

Circuit Court of Appeals, Fifth Circuit.

Jan. 23, 1946.

David A. Morse, Gen. Counsel, National Labor Relations Board, Malcolm F. Halliday, Associate Gen. Counsel, N. L. R. Board, and Thurlow Smoot, Sr., Atty., N. L. R. Board, all of Washington, D. C., for petitioner.

J. A. Simpson, of Birmingham, Ala., for respondent.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

The respondent, herein called the Company, runs a large bakery in Birmingham, Alabama, with branches in other cities. By an order the National Labor Relations Board commanded that it cease and desist from recognizing the Southern Bakers Employees, Inc., called in this record the Independent, as bargaining agent of the bakery employees at Birmingham, and from giving effect to the contract with it dated May 15, 1943; and from discouraging membership in and discharging members of United Bakery Workers Union No. 441, affiliated with the C. I. O., called in the record the Union; and that affirmatively it reinstate several discharged employees with back pay; and reimburse to all employees all dues paid by each to the Independent.

■ The jurisdiction of the Board is questioned because respondent ships none of its products in interstate commerce. But it imports into the State the greater part of its raw materials, the imports being of a value of about $25,000 per month. Imports as well as exports are interstate commerce and would be equally "affected" by a work stoppage, within the meaning of the National Labor Relations Act, 29 U.S.C.A. § 160(a); and $300,000 of such commerce per year is considerable enough to warrant the Board in taking jurisdiction.

As to the action taken by the Board, the Independent, though a party defending itself by counsel in the Board's proceedings, has not appeared in this court. The employer respondent states by its counsel that it has no interest in the Independent or the maintenance of its contract and does not object to the cease and desist orders touching them, but it does defend the propriety of its own conduct and insist that there is no law or evidence to justify the monetary penalties visited on it. Most of the discharges occurred on the demand of the Independent because the discharged employees were not paying dues to the Independent as required by the union shop and maintenance of membership clauses in the contract, so that the propriety of these discharges necessarily involves the validity of the contract. National Labor Relations Board v. Electric Vacuum Cleaner Co., Inc., 315 U.S. 685, 62 S.Ct. 846, 86 L.Ed. 1120; Wallace Corporation v. National Labor Relations Board, 323 U.S. 248, 65 S.Ct. 238. The restoration of dues also rests upon the idea that the employer had unlawfully established the Independent, and by the making of the closed shop contract had extorted them. Virginia Electric & Power Co. v. National Labor Relations Board 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568.

■ Under the Act, 29 U.S.C.A. § 160 (e), this court on this petition for enforcement has "jurisdiction of the proceeding and of the question determined therein," and may enter "a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." "The findings of the Board * * * if supported by evidence, shall be conclusive." It is our duty, as well as the Board's, to see that the Act is properly and fairly applied, and not brought into disrepute by unlawful or palpably unjust applications of it. The general responsibility for fair and true fact findings is on the Board. As to them, we are to judge only whether they are supported by evidence. This latter task we find difficult in this case. The Record consists of about 3000 pages. The intermediate report of the trial examiner seems to us more like a trial argument than a judicial deliverance. Every issue without exception he found in favor of the

Union. He resolved every conflict in testimony, whether serious or trivial, in favor of the Union. With complete consistency he found every witness for the Union reliable and truthful, and every opposing witness, whether the Company's president and supervisors, or Independent's adherents, untruthful and unreliable. Even witnesses called by the Board were reliable when they testified favorably to the Union, but otherwise not reliable. The Board approved this report and its recommendations where not expressly disapproved. The Board, however, limited more fairly what is to be paid some of the discharged employees. And it completely rejected the finding that the Union was the majority choice as bargaining representative, and refound the facts touching that question, and it concluded that the evidence did not show that the Union ever had a majority. This seems to us to change the aspect of the whole case, and to upset the basis of some of the other conclusions.

As the Board found the relevant facts the Union began its effort at organization in the summer of 1941, and on Dec. 2, 1941, advised the Company it represented a majority. The Company questioned the claim and suggested an election conducted by the Board. The Union made such a request to the Board, but a field examiner reported to the Board that there was a disagreement between the Company and the Union as to whether the bread salesmen ought to be included in the bargaining unit. The Board did not define the proper unit under 29 U.S.C.A. § 159, but dismissed the petition without a hearing on Dec. 31, 1941. No agreement being reached, the Union advised the Company that a strike was imminent.

The Board does not advert to it, but it is an uncontroverted fact that at this time there had been presented a petition signed by 49 of the 65 bakery workers which stated: "We the undersigned employees of McGough Bakeries Corporation production department desire to state that we do not wish to join the Birmingham Bakery Workers Union of the C. I. O. nor do we wish it to represent us in any way." Witnesses sworn for the Board who got up this petition testify that it was their own idea and work, and that the Company had nothing to do with it. No one testifies otherwise. The Company telegraphed the Board to Washington, apparently just before Saturday, Feb. 7, 1942, "A majority of our employees in a written petition have denied us the right to bargain with the C. I. O. for them. C. I. O. claims a majority but does not consent to an election. N. L. R. B. Atlanta will not act. No matter which way we decide we will no doubt have a strike Saturday. If we negotiate with C. I. O. one group threatens sit down strike, and if we don't negotiate with C. I. O. they threaten strike. Saturday is deadline. We beg for advice and help." The Board again did nothing. On May 9, however, the Regional Director at Atlanta in response to a telephone call telegraphed that the Board would not direct an investigation on an employer's petition unless two or more labor organizations each claimed a majority.

Resuming the facts found by the Board: On Saturday, Feb. 7, 1942, the Union called a strike and posted a numerous picket line that evening around the plant and it prevented the night shift which was to make bread for Monday's deliveries from entering, and operations were stopped. The Union proposed to end the strike only if given immediate recognition as exclusive bargaining agent. On Sunday, Feb. 8, the Company "in order to resume its breadmaking reluctantly capitulated to the Union's demands and the next day signed with it a closed shop contract for a term of about three months." Several employees thereupon started an anti-union movement again, the Board says with respondent's knowledge and approval. (The evidence is that it was openly done and everyone knew of it, and there is evidence that the President said when the resulting petitions were brought to him, they were all right. There is no evidence of Company instigation. The sponsors testify they acted on their own motion.) Forty-two of the sixty-five production employees signed a petition to the Company which said simply: "We the following employees do not want the C. I. O. to represent us with the Company any longer." Nearly all the salesmen signed another which said: "We understand that the new contract includes the Sales Department and we do not want the C. I. O. to represent us." These the President referred to the Company's attorney, who sent them to the Regional Director, N. L. R. B., with a request for an election. The Director again said no election would be held where only one labor organization was involved. So the Company on May 10 executed a second closed shop agreement with the Union to continue for one year. The

following February five sponsors of the anti-Union movement got together and contributing ten dollars each hired a lawyer to get a charter for and assist in organizing the Independent. On February 24, 1943, the Independent, claiming a majority representation, asked to be bargained with for a new contract then presented. The Company refused (on the ground that the current contract would not expire till May 10), and suggested that Independent file a representation petition to the Board. On March 5 such a petition was filed, but the Union filed a charge of Company domination. The Board took no action on either. On May 15, 1943, the Independent again presented, and after a two hours resistance to two provisions, and after some amendments, the Company signed a closed shop agreement with the Independent. Under its provisions and at the request of Independent most of the discharges in controversy occurred, for non-payment of dues to the Independent.

■ The Board finds that the Union at no time had a majority. The uncontradicted evidence is that Independent had twenty-four signed representation cards on Feb. 24, and as many more were signed during March. They, or a list of them, were presented to the Company before a contract was signed. The Board discounts this evidence by saying: "However the record shows that at that time a substantial number of the same employees were also members of the Union." We have not discovered the part of the record referred to, but the Board finds that the "turnover" in the payroll in the preceding year had been about fifty per cent. Old Union lists would therefore be obsolete. But if the Board is correct and if many of the Independent signers were also in May members of the Union, it is incorrect to suppose that their Union membership cut them off from selecting a new bargaining agent. They all had to join the Union to hold their jobs. The suggestion of the Board, if upheld, would prevent a union which has a closed shop contract from ever being placed as a bargaining representative. See Wallace Corporation v. National Labor Board, supra, 323 U.S. at page 255, 65 S.Ct. 238; and National Labor Board v. Electric Cleaner Co., supra, 315 U.S. at page 691, 62 S.Ct. 846, 86 L.Ed. 1120.. The Board did not find that the Independent did not have a majority. The evidence shows it did.

■ In fighting the rise of the Independent the Union asked the suspension of two of the leaders of the Independent as being in bad standing for disloyalty to the Union in circulating the petitions above mentioned. The Company complied. The Union members after five weeks voted to ask their reemployment, and this was done. Later, on March 2, 1943, the Union in writing requested the suspension of the three other leaders, Bunch, King, and Griffin, for non-payment of Union dues and disloyalty. This request was not granted, and was complained of as a breach of the Union's contract and was so found by the trial examiner. The Board finding that the Union had never represented a majority, ruled that the Company was right in refusing to bargain further with them. We hold it follows also that the Union's contract was in truth not binding as a collective bargain under the Act; the Company did wrong in suspending the first two and right in refusing to suspend the last three men above mentioned. Unwilling payers of union dues to the Union might probably have asked reimbursement. The Company, however, refused to contract with Independent before the expiration of Union's contract on May 10, though Union had coerced the making of it by the use of an unlawful strike; unlawful, we say, because the Act is designed to prevent strikes, and will not tolerate the use of this weapon to substitute the free choice of a majority in attaining the position of a bargaining representative. The Company waited in vain on the Board, for the fourth time, to ascertain with whom it should bargain. Five days after the unlawful contract expired it contacted with Independent, which truly represented a majority, after objecting for some hours to two features of the contract. The closed shop clause was in all three contracts. It appears the Company has one or more contracts with C. I. O. in other cities, which probably contain the same provision. The closed shop seems to have on all occasions been taken as a matter of course. The Act authorizes such a contract if made by a majority representative who was "not established, maintained, or assisted by any * * * unfair labor practice." 29 U.S. C.A. § 158(3).

■ We thus come to the question whether Independent was, when the contract was made, established, maintained or assisted by an unfair labor practice. The Board makes no independent examination

of the facts about that, and merely refers to the intermediate report. In that report, under the head of Domination and Interference, the facts about Independent are set forth. There is some criticism made of this union's internal set-up, but all that is put forward as coming from the Company is this: President McGough looked at the contract presented to him on Feb. 24, and the showing of majority representation, and stated that he was still under contract with the Union and could not then negotiate with the Independent, and advised that "they would have to have it certified in a legal way." The trial examiner thought he meant that the Independent should be certified by the Board. The Independent so understood and did seek an election an certification, but the Board did nothing. The next fact brought forward in the inter-. mediate report is that the Company then began to violate its contract with the Union by ceasing to require new employees to register with the Union; by refusing to act on the suspension of Bunch, Griffin and King or to talk with the representative of the Union about it; by refusing to discuss an amendment of the contract; and by finally saying (truthfully) the contract expired last night and there was no desire to talk more about it. The correction the Board made as to the facts destroys all this as any sort of unfair labor practice. There never was a true collective contract with the Union. Nothing ought to have been done pursuant to it. The refusal to go on with it was according to law and not against law. The trial examiner next brings forward the fact that the Independent was contracted with. It had a right to be, since it was in fact the majority representative. The occurrences at the meeting of the members of the Independent which prepared the proposed contract, and at the meeting with the President and others representing the Company when it was amended and signed, are detailed. There is nothing unusual about them. They confirm the sworn testimony that the Company had nothing to do with the preparation of the proposed contract, as it had nothing to do with the formation of the Independent. The Company then let the Independent put a notice in the bulletin board advising employees of the signing of the contract, and of its requirements about

joining the Independent. That was legitimate information. The Company six weeks later did not allow the Union to post in the bulletin board notices of its meetings. It seems to us that the Company did well not to make its board the vehicle of ordinary union notices for either union. The trial examiner then finds that the solicitation of membership had been open and vigorous in the plant and the Company knew it through the supervisory employees. There was no rule against it. Employers can sometimes make such a rule [1] but are not bound to. The father of one employee complained to the superintendent of strenuous solicitation of his son. What the superintendent did is not stated, but if he had interfered, without a general and impartial rule on the subject, his act would have been one favoring the Union. One foreman is testified to have told Ed Baine that McGough could do more for him than Parker, the Union leader. The foreman denied it, but he was held to be of "dubious credibility." Even so, it was unauthorized by and unknown to the Company, and so far as appears only Baine heard it, and it did not affect him. Several months after the contract was made the superintendent resigned [2] and there were promotions caused thereby. Bunch, King and Martin, who had been active in the Independent, were made foremen. This proves no domination of or assistance to Independent in securing its majority and its contract months before. Several other persons were promoted. There is no showing that Bunch, King and Martin were not good men for the jobs given them. Previously Bunch, in arguing with a Union man while both were mere employees, is found to have said that he, Bunch, would do better out of the Union and would be a foreman. He did not say nor is it proven that any such thing had been promised him. Employees can talk that way among themselves and not involve their employer thereby. And lastly the trial examiner advances, as showing domination and support of Independent, the discharge of men who would not pay Independent dues by reason of the contract. Thus living up to the contract, authorized by law, of course does not violate the law, nor prove that the bargaining agent who made the contract was dominated or assisted by the employer. If it did, every closed

---

[1] But the enforcement of such rules was disapproved in National Labor Board v. Le Tourneau Co., and Republic Aviation Co. v. National Labor Board, 324 U.S. 793, 65 S.Ct. 982, 157 A.L.R. 1081.

[2] The evidence is that the shipping clerk also resigned, and an acting foreman was called into the Army.

shop contract would destroy itself and the union which negotiated it, if there was a rival union. The account given by Bunch, King and Martin, all sworn by the Board as witnesses, of the formation of the Independent and of the contract with it, is consistent and uncontradicted and shows no unlawful domination of, or assistance to, Independent. This sworn testimony cannot be over-ridden by suspicion or by slight circumstances that may be given another color. See Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 341, 53 S.Ct. 391, 77 L.Ed. 819; Chesapeake and Ohio R. R. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983.

■ We are therefore well satisfied that the order to pay lost wages to employees discharged at the requirement of Independent ought not to be enforced. The discharges were not discriminatory, but were in pursuance of a contract authorized by statute.

■ As to dues paid, if Independent had been concocted by the Company to oust the Union by means of a closed shop contract, and thereby unwilling employees in order to keep their jobs were forced to pay Independent dues (25 cents per week against $1 to the Union) Independent ought to be annulled, the contract abrogated, and the dues repaid. Such was thought to be the case in Virginia Electric & Power Co. v. National Labor Board, supra. If there was slight interference, enough to disestablish the Independent and its contract for the future, as being an obstruction to fair collective bargaining, but a majority of the employees have freely adhered to it and paid its dues, we do not see that it would be just or could effectuate the purposes of any just law to make the employer repay all dues for the life of the Independent, both to those who freely supported it and those who did not. But we need not discuss that problem, for we think no such interference is here proven as ought to annul the collective contract.

■ The other discharges, made for reasons other than to comply with the collective bargain, occurred after the Independent was organized and had attained majority status. They present the usual contentions that they were for good cause and not for union activity or for testifying in this proceeding. We would not ourselves as to them have found as the trial examiner did, but as they present issues of fact and credibility, we accept the findings made and will enforce the order with respect thereto.

Since, therefore, the cease and desist parts of the Board's order and the disestablishment of the Independent operate only in futuro, and since no one opposes, we will decree enforcement of Part I, paragraphs (a), (b), (c), (d), (e), and (f), and of Part II, paragraph (a). We will refuse enforcement of the other paragraphs in so far as they relate to discharges under the collective contract while it was in effect, and of paragraph (d) as to reimbursement of dues paid to Independent. We will decree enforcement of Part II of the order as thus modified. Let a decree be prepared accordingly.

Modified and enforced.