## PITTSBURGH S. S. CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 10372.

Circuit Court of Appeals, Sixth Circuit.

April 5, 1948.

Lee C. Hinslea and Lucian Y. Ray, both of Cleveland, Ohio (Leckie McCreary Schlitz & Hinslea, of Cleveland, Ohio, on the brief; Lee C. Hinslea and Lucian Y. Ray, both of Cleveland, Ohio, of counsel), for petitioner.

Louis Belkin, of Cleveland, Ohio (David P. Findling, Ruth Weyand, and Fannie M. Boyls, all of Washington, D. C., on the brief), for respondent.

Before SIMONS, ALLEN and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

Upon the filing of the petition to review and set aside an order of the National Labor Relations Board, the Board responds with a request for its enforcement. The petitioner assails the order on the ground that the Board made no independent findings; that the findings and conclusions of the trial examiner, which it adopted, were arbitrary and biased; and that the evidence fails to establish the unfair labor practices upon which the Board's order was based.

The petitioner operates 73 vessels on the Great Lakes and their tributary waters, engaged in carrying iron ore, coal and limestone. They are manned by approximately 600 licensed officers and 2,000 unlicensed men. Prior to 1943 the petitioner's employees had never been represented by any labor organization. In that year the National Maritime Union undertook to organize its unlicensed personnel and pursuant to a stipulation between the petitioner and the union for the certification of

an election, one was held in June, 1944, which resulted in the union's defeat. It became the contention of the Board that in the two month period between the start of the 1944 sailing season and the date of the election, the petitioner engaged in a course of conduct which was designed and calculated to insure the defeat of the union and to frustrate its organizational efforts; that this was done by the petitioner's distribution to employees of letters and literature relating to the union and its campaign, statements and activities of licensed officers upon its vessels of a threatening and disparaging character, interrogation of its employees concerning union membership, abuse of employee organizers and the discharge of an organizer named Shartle, for union activities.

Our first consideration must be given to the so-called Ferbert letters. These were two signed by the petitioner's president, A. H. Ferbert, and addressed to the unlicensed men, in which he stated that they would be better off if they remained unorganized for reasons therein detailed, but in which he advised the men that they were free to join the union; that this would not affect their position and that the company would continue to afford the right to work to qualified seamen whether or not they joined or did not join a labor union. The Ferbert letters contain no threats or suggestion of coercion and on their face seem clearly to be within the right of an employer to express his views upon labor relations,—a right found, in many cases, to be within the protection of the constitutional right of free speech. The trial examiner found them of sinister character designed to discredit the union and its objectives, mainly because of alleged inaccuracies in respect to the effect of the "rotary hiring" practices of the union and the extent of government control over wage changes exercised by the War Labor Board. We have not heretofore thought that the right of free speech depends upon the accuracy of the ideas expressed. N. L. R. B. v. Brown-Brockmeyer Co., 6 Cir., 143 F.2d 537. However, it becomes unnecessary for us to give detailed consideration to whether the letters themselves were in any respect coercive because of the Board's finding that they were not unlawful per se, but

became so only because they constituted an integral and inseparable part of the petitioner's otherwise illegal course of conduct, and when so viewed, assumed a coercive character not privileged by the right of free speech. It becomes necessary, therefore, to give primary consideration to the alleged acts held to form the background against which the letters must be viewed in order to determine the validity of the Board's order.

Other than its finding in respect to the Ferbert letters and a specific finding that Shartle had been discharged for union activities, the Board made no independent findings of fact but adopted the findings, conclusions and recommendations of the trial examiner in what is referred to as its "short-form" order. It therein issued its cease and desist directives requiring the petitioner to refrain from discouraging membership in the union, by discharging or refusing to reinstate any of its employees, by discriminating in regard to their hire and tenure of employment, or in any other manner interfering with their right of self-organization, or their right to bargain collectively and to take affirmative action which included the reinstatement of Shartle to his former or an equivalent position, to make him whole for his loss of pay and to post the usual notices.

Its order is vigorously attacked by the petitioner on the ground that § 10(c) of the National Labor Relations Act, 29 U.S.C. A. § 160(c), requires the Board itself to find the facts upon which its orders are based, and to state them as found. This, it is urged, is a non-delegable duty of the Board and the petitioner had a right to look to the decision itself for findings upon which the order is based in respect to every material issue. It further points to the fact that the transcript consisted of approximately 1,350 pages, that 1½ months intervened between the oral argument to the Board and the announcement of its decision and that it must be apparent from the length and complexity of the record, that only lip service was rendered to the statutory requirement that the Board itself find the facts. It characterizes pro forma acceptance as an evil inherent in a "rubber stamp" approval by administrative agencies of a subordin-

128

ate's work—strongly condemned by the Supreme Court of New York. New York State Relations Board v. Grief Realty Corp., 188 Miss. 549, 70 N.Y.S. 288, and urges that Federal Courts of Appeals have taken the same view. N. L. R. B. v. Elkland Leather Co., 3 Cir., 114 F.2d 221; Burk Bros. v. N. L. R. B., 3 Cir., 117 F.2d 686. Finally, it insists that due process requires not merely a hearing before .the Board and the right to except to adverse findings of the trial examiner, but that the Board make its own evaluation of the weight and credibility of the testimony and its own findings based upon that evaluation, and that unless that is done law gives way to arbitrary power.

■■ It is undoubtedly a requirement of due process that "the one who decides must hear." Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288. Had the Board decided the issues involved without considering the record, without receiving and considering exceptions to the trial examiner's findings and without argument thereon, its decision would certainly be condemned as arbitrary. Here, however, briefs were submitted, oral argument had and the Board, in its order, recites that the argument, briefs and the entire record were considered. It is not "the function of the court to probe the mental processes of the [Board] in reaching * * * conclusions if [it] gave the hearing which the law required." Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 776, 82 L.Ed. 1129. Adoption of a trial examiner's findings and conclusions does not necessarily mean that the Board has abdicated in favor of mental processes extrinsic to its own. N. L. R. B. v. Botany Worsted Mills, 3 Cir., 106 F. 2d 263; N. L. R. B. v. Jasper Chair Co., 7 Cir., 138 F.2d 756.

The petitioner's challenge to the Board's order, however, cuts much deeper. A careful examination of the record will demonstrate, it contends, that the trial examiner emerges not as an impartial trier of the facts but as a zealous advocate of the union. Every witness who testified for the union was found to be reliable and truthful, and all who were called by the petitioner, evasive and unreliable. Not one of the petitioner's witnesses who testified con-

cerning the alleged unfair labor practices, was trustworthy, and the veracity and good faith of no witness for the union was questioned. This situation, it is contended, is not only unique but portrays either a complete lack of judicial approach on the part of the examiner, or, what is more serious, a damaging bias in favor of the union. The union's witnesses were all union organizers headed by the union's vice-president. The petitioner's witnesses included the masters, mates, chief engineers and other employees entrusted with great responsibility in the operation of its vessels. Moreover, such officers as were charged with having committed unfair labor practices were employed on but 7 of the 73 ships of the petitioner's fleet, and though they had been instructed by the petitioner that its attitude toward organization was a neutral one, their conduct was held to be in pursuance of a general purpose to coerce and intimidate the unlicensed seamen in their efforts at organization, according to a defined pattern.

■■ If the charges of bias are substantially true, · it must follow that the trial examiner's findings are not entitled to credence and that their infirmity must be imputed to the Board, for "a trial by a biased judge is not in conformity with 'due process of law.'" N. L. R. B. v. Ford Motor Co., 6 Cir., 114 F.2d 905 ; Berkshire Employees Assn. v. N. L. R. B., 3 Cir., 121 F.2d 235. "When the fault of bias and prejudice in a judge first rears its ugly head, its effect remains throughout the whole proceeding." N. L. R. B. v. Phelps, 5 Cir., 136 F.2d 562, 563, and bias on the part of a trial examiner may be so prejudicial that enforcement must be denied. N. L. R. B. v. Western Cartage Co., 2 Cir., 138 F.2d 551.

■■ This challenge to the verity of the findings and the validity of the order has lead us to a careful consideration of the record. Without exception, whenever there was a conflict of evidence, the witnesses for the petitioner were held to be untrustworthy and those for the union reliable. Captain Brinker of the steamer William J. Filbert, gave evidence that was held to be highly improbable and McGuiness, a member of a rival labor organization, corroborating

portions of his testimony, was deemed "generally indefinite, contradictory and unreliable," though Lee, an organizer, by his demeanor and candor, impressed the examiner as a completely credible witness. The union seamen on the Horace Johnson and the McGonagle, were characterized as forthright witnesses and their testimony credited as fact. The testimony of Captain Lawless of the Robert W. Bunson, was held to be less reasonable than that of seaman Vogt. Third Mate Carr is discredited upon the testimony of Vogt. On the Peter A. B. Widener, Captain Lehne, master of the vessel, gave testimony which was held to be "indefinite, evasive and lacking in conviction," whereas Babin, a seaman, impressed the examiner as a truthful witness. Hungar, the chief engineer, was "confused, contradictory and unreliable." On the steamer Samuel F. B. Morse, the examiner found Zmrazek, a seaman, truthful, while Captain Gerlach was "evasive, contradictory and improbable," and an unreliable witness. Captain Murray of the steamer Irving S. Olds, was "generally evasive, at times improbable and inconsistent," while First Mate Dobson "lacked conviction" and was not credited. Third Mate Hewer was "vague, hesitant and generally unconvincing," and his demeanor did not invite credence. Shartle's testimony, on the other hand, impressed the examiner as reasonable and probable. Second Mate Chrobak, who contradicted Shartle, gave testimony that appeared to be "greatly exaggerated and unreliable." It lacked conviction. On the same point, Mates Dobson and Hewer were too general in their testimony to permit appraisal.

Courts have recognized that it is contrary to human experience that all witnesses on one side of a case are falsifiers while those on the other side are all truthful, and this conclusion must be obvious to anyone with even a minimum experience as a trier of facts. It was said in the Second Circuit Court of Appeals, "If an administrative agency ignores all the evidence given by one side in a controversy, and with studied design gives credence to the testimony of the other side, the findings would be arbitrary and not in accord with the legal requirement." N.L.R.B. v. Sartorious & Co., 140 F.2d 203, 205. We expressed a similar view in N.L.R.B. v. Grieder Machine Tool & Die Co., 6 Cir., 142 F.2d 163. In N.L.R.B. v. McGough Bakeries Corp., 5 Cir., 153 F.2d 420, 421, the court observed: "The intermediate report of the trial examiner seems to us more like a trial argument than a judicial deliverance. Every issue without exception he found in favor of the Union. He resolved every conflict in testimony, whether serious or trivial, in favor of the Union. With complete consistency he found every witness for the Union reliable and truthful, and every opposing witness, whether the Company's president and supervisors, or Independent's adherents, untruthful and unreliable." These observations in one form or another, might be multiplied, and apply with remarkable fidelity to the findings in the present case. It is enough to say that the unvarying repudiation of every witness for the petitioner because of falsity, evasion or faint recollection, along with the consistent exaltation of every union witness as truthful, forthright and accurate, destroys completely any confidence that might otherwise be placed in the findings of the trial examiner and stamp them as arbitrary. The Labor Board having adopted them in toto, its blanket pro forma findings are in no better posture. It is true that courts have sometimes affirmed the Board's orders while severely criticizing the attitude of the examiner, but in such cases the Board's findings were independently made with exacting analysis of the evidence upon which they rest, and a judicious screening of unsupported findings. This is not the situation here. With due respect for the rule that the findings of the Board are binding upon us if based upon evidence, it becomes impossible to sustain an order upon the adoption of a trial examiner's report which, upon its face, so clearly bears the imprint of bias and prejudice that it lacks all semblance of fair judicial determination.

Enforcement denied.