## TRIPLEX SCREW CO. v. NATIONAL LABOR RELATIONS BOARD.

.No. 8725.

Circuit Court of Appeals, Sixth Circuit.
March 14, 1941.

C. W. Sellers, of Cleveland, Ohio (Thompson, Hine & Flory and C. W. Sellers, all of Cleveland, Ohio, on the brief), for petitioner.

Louis Libbin, of Washington, D.C. (Robert B. Watts, Laurence A. Knapp, Ernest A. Gross, Lewis M. Gill, and Margaret Holmes McDowell, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

On a broad petition praying that this court review and set aside an order of the National Labor Relations Board, the petitioner, Triplex Screw Company of Cleveland, Ohio, admits practical concern with only that portion of the order which awards back pay to eight employees, although petitioner asserts that all findings of fact and conclusions of law and the entire order of the Board adverse to it were erroneous and unsupported by substantial evidence.

In reply, the National Labor Relations Board defends its order of July 31, 1940, as valid and proper in all respects, when modified to the extent suggested and hereinafter directed, and insists that its findings of fact are supported by substantial evidence; wherefore enforcement of its order is asked.

The order of the Board directed the Triplex Screw Company (1) to cease and desist from unfair labor practices especially in dominating, interfering with or contributing support to Independent Employees Association of Triplex Screw Co., Inc. (the Association), or from discouraging membership in Amalgamated Association of Iron, Steel and Tin Workers of North America, Local No. 1583 (the union), or any other labor organization of its employees, by discharging or laying off any of its employees or in any other manner discriminating in regard to their hire and tenure of employment, or with respect to any term or condition of their employment; (2) to disestablish the Independent Employees Association as a collective bargaining representative of employees of the Triplex Screw Company; (3) to reinstate with back pay eight named employees, found to have been discriminated against when discharged from employment; and (4) to post appropriate notices and notify the Regional Director in compliance with the National Labor Relations Act. 49 Stat. 449, 29 U.S.C.A., Supp. V, § 151 et seq.

The Board found that the Triplex Screw Company had not refused to bargain collectively with the union within the meaning of sections 2(6) and 2(7) of the Act; and that the employer had not engaged in unfair labor practices as to 34 named employees, whose complaints were accordingly dismissed.

■■■■ It seems almost needless to restate in this opinion the principle that a Court of Appeals must enforce an order of the National Labor Relations Board if there is substantial evidence to support the findings of fact upon which the order was based, even though the court's own inferences from the evidence and its independent judgment would lead to an opposite conclusion from that reached by the Board. The decision of the Board where the testimony is conflicting is conclusive of the facts and binding upon the court of review. National Labor Relations Board v. Dow Chemical Company, 6 Cir., 117 F.2d 455, decided Feb. 6, 1941; H. J. Heinz Co. v. National Labor Relations Board, 6 Cir., 110 F.2d 843, 847, affirmed 61 S.Ct. 320, 322, 85 L.Ed. ——; National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed.

704; National Labor Relations Board v. Link-Belt Company, 61 S.Ct. 358, 85 L.Ed. ——.

■ This tenet makes plain our duty to uphold and enforce the cease and desist and also the disestablishment requirements of the Board's order in the instant case. Though there are many contradictions, substantial evidence supports the findings of the Board that the Triplex company engaged in unfair labor practices in contravention of section 7 of the Act through unlawful acts of interference, restraint, coercion and domination.

From the inception of union organization activities in his plant, the president of the Triplex company adopted a hostile attitude toward unionization of the plant, although he did not ultimately decline to bargain with the union representatives. Numerous witnesses testified that this chief company official repeatedly and roundly cursed the union and all its works. His alleged language quoted in the record would be sufficient to demonstrate his bitter antagonism. But testimony in the record reveals numerous instances where he denounced or threatened to discharge employees for union activities.

There is evidence withal that the president not only discouraged organization of an outside union, but encouraged and fostered the formation of a company union. While the union was struggling for a foothold, he suggested to a group of employees, "why don't you form your own union. * * * You can get yourself a lawyer there for fifty dollars and you can send him down to Columbus and get yourself a charter."

Later the company's industrial engineer in charge of production voiced the same sentiment and some of the employees retained an attorney and obtained a charter for the Independent Employees Association. A man personally hired by the president as "stock chaser"—a position which afforded access to all departments of the factory—became a sort of recruiting sergeant for the enlistment of employees in the Association which developed rather more into an inane social club than into a live collective bargaining unit. This company union organizer vigorously and successfully solicited memberships, threatening the workers and asserting that he had company backing.

The opinion of the Supreme Court in International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. ——, impels the conclusion that here as there the finding of the National Labor Relations Board that a labor organization was "assisted" by unfair labor practices of the employer is supported by substantial evidence. The language of the Machinists' case, supra, seems quite as applicable here (Opinion pages 78, 80 of 311 U.S., 61 S.Ct. page 87, 85 L.Ed. ——): "Petitioner insists that the employer's hostility to U. A. W. cannot be translated into assistance to the petitioner and that none of the acts of the employees * * * who were soliciting for petitioner, can be attributed to the employer. We disagree with that view. * * * Known hostility to one union and clear discrimination against it may indeed make seemingly trivial intimations of preference for another union powerful assistance for it. Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure. The freedom of activity permitted one group and the close surveillance given another may be more powerful support for the former than campaign utterances. * * * Where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates. Here there was ample evidence to support that inference."

See, also, National Labor Relations Board v. Link-Belt Company, 61 S.Ct. 358, 365, 366, 85 L.Ed. ——; Atlas Underwear Company v. National Labor Relations Board, 6 Cir., 116 F.2d 1020, decided Jan. 15, 1941, and H. J. Heinz Co. v. N. L. R. B., supra.

We come now to discussion of what petitioner terms the question of practical importance. Is the order of the Board allowing back pay approximating twenty thousand dollars to eight named employees supported by substantial evidence? Triplex vigorously answers no; insisting that the uncontradicted evidence shows that the discharged employees were laid off solely on account of economic conditions and not from motives of discrimination because of their union activities. Especial emphasis is laid upon the fact that the union, when requested by the company to designate

among its membership those who should be first laid off as reduction of employment became necessary through conditions beyond the employer's control, refused to name the men and women, because each union member desired to be the last one dropped.

Further stress is placed upon the uncontroverted figures showing that of fifty-three employees mentioned in the original and amended complaint, the names of eleven were withdrawn by the Board, two persons were found still working and six to have quit or resigned, twenty-six were found not to have been discriminated against, and charges of discrimination as to only eight employees were sustained.

The Board found that the Triplex Company terminated the employment of eight named persons, "because of their leadership, membership, or activity in, and loyalty to, the Union."

■ All of the eight discharged employees were either officers, charter members, or active participants in the union. The Board, in its decision, correctly stated that "the question in all cases must be whether the respondent in dismissing the * * * employees was guided * * * by matters of comparative efficiency, and, other factors being equal, by seniority, or whether it was guided by anti-union considerations." National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U. S. 333, 346, 347, 58 S.Ct. 904, 82 L.Ed. 1381; National Labor Relations Board v. Willard, Inc., 68 App.D.C. 372, 98 F.2d 244; Kansas City Power & Light Co. v. National Labor Relations Board, 8 Cir., 111 F.2d 340, 355.

■■ Under this true standard, we find substantial evidence in the record to support the finding of the Board in the instance of each of the eight dismissed employees, whose rights to back pay are before us for adjudication.

We advert briefly to the situation in the case of each of these eight individual employees.

*Grace Koberna.* Evidence of discrimination against her is substantial. The company president once angrily informed her that just because she had joined the union was "not a sign" that he could not "fire" her. She had been a charter member and had solicited others to join the union, had held office in the organization as recording secretary, financial secretary and committee steward, and as secretary of a negotiation committee had participated in conferences with the management of the company. Less efficient workers in the same department were re-employed. It seems a fair inference that, as the Board found, she was not recalled to work "because of her union leadership and activity, and in order to set an example for other employees who persisted in their loyalty to the Union."

*Stanley Ksepko.* Here too there is plain evidence of discrimination against one of the first joiners of the union. When he was dismissed, another employee of less seniority was retained on the same type of work. There was no proof that the junior was a better workman. When the discharged man sought reinstatement, the irate president of the company pushed him away, saying: "Get the hell out of here; I don't need you over here; I don't need the C. I. O. any more."

*Chester Pokropski.* This active union man who openly displayed his button was discharged, while two employees, listless in union activity, who ranked below him in seniority were retained at the same sort of work. The inference of discrimination drawn by the Board was not unwarranted.

*Laddie Sindelar.* At the time this "shearman," an enthusiastic button-wearing union member, was cut from the payroll, two shearmen of inferior seniority were kept on. The inference of the Board that there was discrimination is, therefore, supported.

*Bruno Graczyk.* As the Board remarked, this man as shop steward in charge of collecting dues and as a member of the grievance committee "held an office important to the continued functioning of the Union." Here, too, the dismissal of a union leader, when two employees of considerably less seniority were continued at the same work, is significant of discrimination.

*John Kwiatkowski.* The reason for animus against this discharged workman, whose job was filled by the hiring of a new employee, was plainly demonstrated. When wearing a union button, he was accosted by the vigorous company president with the question, "Who gave you that button on your hat? Do you belong to the union?" When he admitted his membership, the employee was told that he would be taken off the job if he "stuck with the union." He stuck; and the president's prediction came true.

*Chester Kinkelaar.* This experienced electrician, who was replaced by a new employee, was first denounced in highhanded and brutal fashion and then discharged. The profane president of Triplex addressed him in vulgar language to which we have heretofore referred without quotation, berating him as a "Communist," who started the "* * * damn Union." We think the comment of the Board is justified that this employee's discharge resulted from the determination of the company "to oust the Union from its plant by getting rid of those employees upon whom continued existence of that organization depended."

*Josephine Seremak.* The sufficiency of evidence to support the Board's finding with respect to the discharge of this employee has caused us some concern. She admitted that the day before her employment was terminated she "started to clean the machines because there was no work to do," and that her foreman "figured" she had "tried to cheat the company" on her time card. "The whole congeries of facts" (National Labor Relations Board v. Link-Belt Co., supra [61 S.Ct. 361, 85 L.Ed. —]) however, particularly her wearing of a union button while she worked and her active solicitation of membership for the union during lunch hours permitted the Board to indulge the inference that the cause of her discharge was union activity.

■ The petitioner complains that it has been unjustly penalized by the Board in being required to pay wages to these eight employees during the two years and three months delay in the decision of these specific cases of discrimination. The complaint does not fall within the purview of our power to grant relief; the statute contains no time-limit mandate to the National Labor Relations Board for the rendering of its decisions.

■ In Republic Steel Corporation v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. —, where the Board had ordered reinstatement with back pay of employees found to have been unlawfully discharged or denied reinstatement and had directed the employer to deduct from the back pay such amounts as had been received by the employees from governmental agencies for services performed in the meantime on work relief projects, it was held that the Board had no authority to require the employer to pay to the governmental agencies the amounts so deducted.

From this, it follows that paragraph 2(b) of the order of the Board in the instant case must be amended by striking the following language therefrom: "and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, County, Municipal or other Government or Governments which supplied the funds for said projects."

As thus modified, the order of the National Labor Relations Board will be enforced and the petition of the Triplex Screw Company will be denied.