**NATIONAL LABOR RELATIONS BOARD v. ISTHMIAN S.S. CO. (NATIONAL MARITIME UNION OF AMERICA, Intervenor).**

**No. 161.**

Circuit Court of Appeals, Second Circuit.
March 7, 1942.

Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Gerhard P. Van Arkel, Asst. Gen. Counsel, Louis Libbin and Morris P. Glushien, all of Washington, D. C., and Lester Asher, of Chicago, Ill., Attys., National Labor Relations Board, and Aaron Lewittes, of Washington, D. C., for petitioner.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (A. V. Cherbonnier, Robert A. Lilly, and Kenneth B. Halstead, all of New York City, of counsel), for respondent.

William L. Standard, of New York City (Edward J. Malament, of New York City, on the brief), for intervenor.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

This order was the result of occurrences which grew out of a largely successful attempt of the National Maritime Union of America, a labor organization affiliated with the Committee for Industrial Organization, to take into its membership the unlicensed members of the crew of the respondent's S. S. Steel Scientist who were members of the International Seamen's Union of America, a labor organization affiliated with the American Federation of Labor, with which the respondent had a preferential hiring agreement.

While the S. S. Steel Scientist was at Norfolk, Va., early in August 1937 to discharge part of a cargo from the Orient, all but two of the unlicensed members of her crew transferred their union affiliation from the I. S. U. to the N. M. U. The vessel afterwards went to Baltimore, Md., to discharge the remainder of her cargo and to be then fumigated. On August 12, 1937, while the vessel was at Baltimore, Flynn, a representative of the respondent, notified the Baltimore delegate of the I. S. U., Reese, that a fireman was needed on the ship to replace one who was leaving. That union sent a fireman to the vessel but the crew, upon learning that he was a member of the I. S. U. refused to let him work, and early on the morning of August 13, 1927 the fireman so reported to Reese who informed Flynn of that fact and warned him that the I. S. U. expected the respondent to comply with its preferential hiring contract. Flynn reported the situation to the respondent's director of labor relations in New York, Jump, and was told to report the trouble to two named agents of the I. S. U. and let them investigate. The ship was due to sail for Portland, Me., that evening and the director of labor relations told Flynn to let him know when it sailed.

It was after this that the respondent, as found by the Board, violated the Act by discriminating against certain members of the crew in regard to their hire and tenure of employment because of their union membership in violation of § 8 of the Act, 29 U.S.C.A. § 158. Decision, in the main, must turn upon whether or not there was substantial evidence to support that finding.

In this connection it must first be noticed that the respondent has bitterly objected to the record on the ground that it is not accurate and there is, indeed, much to indicate that in fact it is not. We have, however, been compelled to deny two motions the respondent has made to secure its correction because of a stipulation that it might be used as the basis of the Board's decision and the present attack upon it must meet the same fate because our power to deal with the record, as otherwise we might, is so curtailed.

Accepting the record as it is, we are convinced that it does show that the respondent's representatives did violate the Act as found by the Board though it must be owned that the fight between the rival unions for membership put the respondent in the equivocal position which led to that result.

After Flynn at Baltimore got in touch with the agents of the I. S. U. as he had been told to do, one of them informed him that if the respondent did not discharge the N. M. U. members of the crew of the Steel Scientist the I. S. U. would call a strike on every vessel of the respondent which docked at Baltimore. Flynn asked the agent if he would supply a new crew for the vessel and the agent told him the I. S. U. could and would do that. He, the agent, also informed Flynn that the N. M. U. members must leave the ship and

that he, not Flynn, would have them removed. Flynn reported to Jump in New York who said, "All right; let the Union [the I. S. U.] handle the thing, but we have got to get the ship going; * * * that is a question for the I. S. U. to handle; we are going to live up to our agreement. Now, the next move is up to the I. S. U. It is up to them. The agreement is very clear and we have got to live up to it and that is all there is to it."

Meanwhile the ship was being fumigated and the crew had left with instructions to return early in the afternoon. They came back to the dock about two o'clock that afternoon but, because of the fumigation, could not then go aboard and were paid while on the dock. This payment of their wages at Baltimore was in accord with the respondent's usual practice and after it was done the crew went aboard. About ten minutes later the crew was ordered to assemble at the No. 3 hatch and was there addressed by Captain Marcosson of the vessel in the presence of Reese. He told the men that he had received word from New York that if they didn't transfer their membership from the N. M. U. to the I. S. U. they would be put off the ship and further said that most of the men had sailed with him for some time; that he was well satisfied with their work and would regret their going but that he had to follow the orders he had received from the respondent. An oiler who had joined the N. M. U. then asked, "Do I understand, Captain, that you are firing us for being N. M. U. men?" Marcosson replied, "Yes, that is what it looks like, son."

Reese then urged the crew to resume membership in the I. S. U. saying in part, "You fellows can change your books back. I have books right here with me. There won't be any argument, and we will give you your I. S. U. book, and you can sail with your I. S. U. books." He also told them the change could be made without charge but none accepted his proposal, though the matter was discussed. After that the crew received no orders to work and did none but remained in and about their quarters until about ten o'clock that evening. Then a group of volunteers from the I. S. U. boarded the vessel and ordered all of the N. M. U. members of the crew to leave. They took their belongings and left without resistance; were replaced by a crew of I. S. U. members who were then hired; and the ship sailed for Portland, Me., with the new crew at about two o'clock in the morning of August 14, 1937. The ship's officers had remained indifferent while the members of the N. M. U. were being removed from the ship.

These facts as found by the Board were in accord with substantial evidence and show that the respondent acquiesced in the removal of the N. M. U. men. When they returned to the ship after being paid off that afternoon they were still members of the crew and the respondent's acquiescence in their ejection from the ship and the hiring of men to replace them amounted to their discharge. Clover Fork Coal Co. v. National Labor Relations Board, 6 Cir., 97 F.2d 331; National Labor Relations Board v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984.

There was some disputed evidence that the discharged members of the crew engaged in a sit-down strike that afternoon but the Board found that they did not and as there was substantial evidential support for the finding we are bound by it.

Nor did the preferential hiring contract give the respondent the right to hire the new crew as it did. That merely provided in this respect that, "It is understood and agreed that, as vacancies occur, members of the International Seamen's Union of America, * * * shall be given preference of employment, if they can satisfactorily qualify to fill the respective positions; provided, however, that this Section shall not be construed to require the discharge of any employee who may not desire to join the Union, or to apply to prompt reshipment, or absence due to illness or accident."

This clause did not justify the creation of vacancies to be filled and bound the respondent only when vacancies did lawfully occur. National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704. As these men were discharged because of their union membership in violation of the Act, there were no vacancies, in contemplation of law, to be filled in accordance with the preferential hiring contract.

The respondent has argued, however, that the order should not be enforced because of the laches of the Board. See, National Labor Relations Board v. National Casket Co., Inc., 2 Cir., 107 F.2d 992. Here the Board did delay some fifteen months after hearing oral argument on

exceptions to the intermediate report before it made the order it now seeks to have enforced. It is true that the statute has set no time limit within which the Board must make its decision, Triplex Screw Co. v. National Labor Relations Board, 6 Cir., 117 F.2d 858, but such a delay should be justified by the circumstances. This record was one of some two thousand pages and involved charges of discrimination on another of respondent's vessels. It was, as we have occasion to know, not as clear and accurate as it should have been and, though not without some doubt, we feel that the Board should not, because of these factors, be charged with inexcusable delay in this instance. The delay which followed its order was not alone its fault as the respondent could have avoided that by a petition to review. § 10(f) of the Act, 29 U.S.C.A. § 160(f). National Labor Relations Board v. Nebel Knitting Co., 4 Cir., 103 F.2d 594; National Labor Relations Board v. Wilson Line, Inc., 3 Cir., 122 F. 2d 809.

■ The respondent having been found to have engaged in unfair labor practices in violation of the Act, was ordered to cease and desist therefrom; to offer all but two of the discharged men (those two not desiring it) immediate and full reinstatement to their former, or to substantially equivalent, positions, if such positions were available, without prejudice to their seniority and other rights and privileges; to place those for whom such positions were not immediately available upon a preferential list; to make the discharged employees whole for loss of pay except the two above mentioned and as to one of them up to December 22, 1937; to post notices of compliance; and to notify the regional director within ten days of the steps taken to comply with the order. The provisions as to the making whole of the discharged men for loss of pay provided that moneys received from work relief should be deducted and paid "to the appropriate fiscal agency of the Federal, State, County, Municipal, or other government or governments which supplied the funds for said work-relief projects." The Board now requests a modification of the order to eliminate this provision in accord with Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 61 S. Ct. 77, 85 L.Ed. 6, and it is so modified. The Board also requests that paragraph 2(d) of the provision as to the posting of notices be changed to read " * * * that the respondent will not engage in the conduct from which it is ordered to cease and desist in paragraphs 1(a) and (b) of this Order; * * * " And it is so modified.

■ As modified the order should be enforced. The discriminatory discharges were in violation of the Act. National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862; National Labor Relations Board v. Entwistle Mfg. Co., 4 Cir., 120 F.2d 532. The requirement for reinstatement is proper. National Labor Relations Board v. Waterman Steamship Corp., supra; South Atlantic Steamship Co. v. National Labor Relations Board, 5 Cir., 116 F.2d 480; Southern Steamship Co. v. National Labor Relations Board, 3 Cir., 120 F.2d 505. And so are the modified provisions for posting notices and making whole for loss of pay. Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

The petition to enforce the modified order is granted.