**NATIONAL LABOR RELATIONS BOARD v. AMERICAN CREOSOTING CO., Inc.**

**No. 9516.**

Circuit Court of Appeals, Sixth Circuit.

Dec. 4, 1943.

194

Dominick Manoli, of Washington, D. C., (Robert B. Watts, Howard Lichtenstein, Ida Klaus, and William J. Avrutis, all of Washington, D. C., on the brief), for petitioner.

Kenneth Gardner and Bernard D. Atwood, both of New York City, on the brief), for respondent.

Before SIMONS, ALLEN, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

Conceding jurisdiction the respondent assails the findings of the National Labor Relations Board as being unsupported by substantial evidence and challenges the validity and appropriateness of its order requiring reinstatement of discharged employees and their compensation for lost wages.

The defendant is a corporation engaged in creosoting railroad ties for the C. & O. Railroad. During the period in which unfair labor practices were allegedly pursued, its employees ranged from 30 to 125, though for the greater part of the period employment was at high level. In December, 1936, organization began among the men which resulted in a C. I. O. charter. The respondent's superintendent at first endeavored to persuade a number of the men

not to join but later withdrew opposition. However, when McKenzie, a construction employee, was "very hot for the union," he was discharged by his foreman assertedly on orders of the construction superintendent. On March 19, 1937, the respondent reached an understanding with the union which was incorporated into a written contract, but the respondent refused to sign. The contract provided that there would be no work-stoppage for six months but that thereafter it could be abrogated upon 30 days' notice. Apparently both parties recognized the agreement as binding, for in September the union notified the respondent that the contract was terminated, that the defendant was operating "on borrowed time," and that the union desired a new contract providing for a closed shop, higher wages, improved working conditions, and the "check-off." The respondent rejected these demands but expressed willingness to continue under the original agreement.

On September 24 the men on the "black crane" refused to work, on October 4 another department stopped and a general strike followed. After fruitless negotiation for settlement, the defendant resumed operations on December 13 with a skeleton crew of strike breakers. On December 23 the men abandoned the strike and returned in a body, but only 11 of them, out of 85, were re-employed. Eventually many more were rehired but 40 were never reinstated, and to these the respondent is now ordered to offer reemployment.

The Board found it to have been an unfair labor practice for the defendant to refuse to sign the original agreement, to refuse otherwise to bargain with the union in good faith, that the strike was the result of such unfair practices and was prolonged by them. The finding that it refused to bargain is on the ground that the respondent failed to submit counter-proposals or to sign an agreement when reached.

██ No useful purpose will be served by again plowing well-furrowed ground. We have already called attention to the broad authority given by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., to the National Labor Relations Board to take evidence and make findings of fact unfettered by the strict rules that govern judicial inquiry, and likewise to the liberality accorded its concept of substantial evidence. Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38, 44, based upon consideration of Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Licorice Co. v. N. L. R. B., 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799, and N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226. Likewise have we pointed to decisions which, beyond possibility of misunderstanding, have repeatedly reminded us that the power to draw inferences was entrusted to the Board and not to the courts. N. L. R. B. v. Thompson Products, 6 Cir., 130 F.2d 363. There we cited N. L. R. B. v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396; N. L. R. B. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; N. L. R. B. v. Newport News Shipbuilding & Dry Docks Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. That interference, even in slight degree, by supervisory employees, with efforts to organize for collective bargaining, is an unfair labor practice regardless of common-law rules respecting delegation of authority to such supervisory employees to interfere, is now beyond controversy. N. L. R. B. v. Piqua Munising Wood Products Co., 6 Cir., 109 F.2d 552, 557; Consumers Power Co. v. N. L. R. B., supra.

██ Similarly it is settled that a refusal to sign an agreement when one has been reached, is a refusal to bargain and so an unfair labor practice. H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309. It is unimportant that allegation respecting this unfair practice was added by amendment to the original complaint, but a few months before the case was heard by the Board, and was not included in the charge as filed by the employees. The respondent had ample opportunity to meet the supplemented complaint, does not claim surprise, and neither at the hearing nor here does it contend that it did sign the agreement, or that it was prepared to sign any supplemental agreement. While the Board drew inference of sinister purpose from some circumstances that may well have been innocuous, we are compelled, by the application of standards set for us by controlling authority, to hold that the findings of unfair labor practices in respect to interference by the respondent with employee freedom of organization and refusal of the respondent

to bargain with its employees, are supported by evidence.

Upon the question of the validity of the Board's order of reinstatement, the respondent contends that while the Act guarantees the right to strike it does not guarantee that the strikers shall win. This may be true, but where an inference is capable of being drawn that unfair labor practices caused the strike, we may not, even if otherwise we could, substitute for it an inference of our own that the strike would have occurred notwithstanding such practices. Moreover, strikers remain employees by virtue of the terms of the Act, 29 U.S.C.A. § 152(3), N. L. R. B. v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, 176, and discrimination in re-employment because of union activity is condemned by the Act. While the respondent claims that it has recently signed a contract with another union now representing a majority of its employees, the contract is of no avail as an escape from the Board's order directing a return to the status existing prior to the alleged unfair labor practices. N. L. R. B. v. Falk Corp., supra; International Association of Machinists v. N. L. R. B., 311 U.S. 72, 78, 61 S.Ct. 83, 85 L.Ed. 50; N. L. R. B. v. Link-Belt Co., supra. As observed by us in the Thompson Products case, supra, "the purpose of the Act is to secure the right of free choice to employees in the selection of their bargaining agency * * * the employer must keep his hands off and completely."

The respondent protests against being required to contribute back-pay from December, 1937, to the date of compliance. While the charges filed with the Board were seasonable, the hearing did not take place until four years after the strike, with the Board's decision coming a year later. Such delay, it is urged, makes the back-pay order unconscionable. However, we held in Triplex Screw Co. v. N. L. R. B., 6 Cir., 117 F.2d 858, that a complaint of this character does not fall within the purview of our power to grant relief since the statute contains no time-limit mandate for the rendering of decisions by the Board. To the same effect are N. L. R. B. v. Isthmian S. S. Co., 2 Cir., 126 F.2d 598; N. L. R. B. v. William Davies Co., 7 Cir., 135 F.2d 179, 183; Eagle-Picher Mining & Smelting Co. v. N. L. R. B., 8 Cir., 119 F.2d 903; N. L. R. B. v. Electric

Vacuum Cleaner Co., 315 U.S. 685, 62 S.Ct. 846, 86 L.Ed. 1120.

In one aspect, however, we perceive invalidity in the Board's order. The respondent is directed to give all of its discharged men back-pay from the date of discrimination to the date of reinstatement or offer of reinstatement. But the evidence is undisputed that it has not, since the strike, employed as many men as it did before, and there is no evidence that such reduction in employment was for the purpose of discriminating against the strikers. There is, on the contrary, positive evidence that reduced employment was the result of a lack of work and the installation of labor-saving devices. It is therefore established by the record, with no reasonable inference permissible otherwise, that not all of the discharged employees would have had employment had there been no discrimination. This was recognized by the trial examiner who recommended a formula for computing payment of back-pay which would take it into account. The Board, however, disregarded his recommendation and directed the reinstatement of all employees named in schedule "A," with compensation for the period they were unemployed, without regard to whether they would have been employed for that period had there been no discrimination. This directive is clearly punitive rather than compensatory, and beyond the power of the Board to make since its functions are preventative and remedial only. It has no power to exact retribution. N. L. R. B. v. Newport News Shipbuilding & Dry Docks Co., supra.

The trial examiner's recommendation was that a lump sum should be computed consisting of all wages, salaries, or other earnings paid out by the respondent since December 23, 1937, the date of the application for reinstatement, to employees who had been hired since October 4, 1937, up to the time the respondent complies with the recommendations, reinstating or placing on a preferential list the employees listed in schedule "A," such lump sum to be divided among all the employees listed in schedule "A," and each of such employees to receive an amount proportionate to the wages paid him prior to the strike, computed from December 23, 1937 to the date of his reinstatement, or placement on a preferential list, less his net earnings during such

period. The examiner's objective was to restore the situation as nearly as possible to that which would have existed but for the illegal discrimination, and his recommendations were designed to achieve it, allowing, however, for the difficulties which the peculiar factual situation presented in fashioning a remedy to restore the status quo.

Were we to assume that the 22 men listed in schedule "A" all possessed equal seniority, it would be our conclusion that the trial examiner's recommendations would with accuracy accomplish the purpose. His recommendation for reinstatement, however, provides that if by reason of a reduction in force there was not sufficient employment immediately available for all to be offered reinstatement, all available positions should be distributed among the remaining employees in accordance with the respondent's usual method of reducing its force without discrimination against any employee because of his union affiliation or activity, following a system of seniority to such extent as had theretofore been applied in the conduct of the respondent's business, and that those employees remaining, after such distribution, for whom no employment was immediately available, should be placed upon a preferential list in accordance with the principles thus set forth, and be offered employment in their former or substantially equivalent positions as such employment became available and before other persons were hired for such work. This recommendation, the Board adopted.

Thus it will be seen that inference of equal seniority among employees listed in schedule "A" may not be drawn, and it will also be seen that the application of the trial examiner's formula will not achieve mathematical precision in restoration of lost compensation to each of the men, for those with greater seniority may be obliged to share with those having less. In this situation remand to the Board for devising a remedy to more accurately compensate employees for lost wages might seem to be indicated. Contemplation of its difficulties, if not its utter impossibility, however, counsels otherwise, for the task would require that consideration be given to each individual's seniority in relation to the rise and fall, perhaps from day to day, of the respondent's curve of employment. Matured consideration therefore leads to the conclusion that the trial examiner's

plan, even though it fails to bring about mathematical precision in distribution of back wages, fairly achieves equitable distribution, in view of the factual situation. The plan envisions the men on schedule "A" to constitute an unjustly treated group, and therefore as a group entitled to the composite of wages paid to the group which replaced it. Thus it arrives at restoration of the status quo as near as may be, under the circumstances.

The order of the Board is amended by substituting for the directive in paragraph 2(d) of its order, insofar as it applies to employees listed in schedule "A", the remedy with respect to such employees recommended in the report of the trial examiner.

So amended, a decree may be entered enforcing the Board's order.