## NATIONAL LABOR RELATIONS BOARD v. GRIEDER MACHINE TOOL & DIE CO.

No. 9611.

Circuit Court of Appeals, Sixth Circuit.
April 13, 1944.

Roman Beck, of Washington, D. C. (Robert B. Watts, Howard Lichtenstein, and David Findling, all of Washington, D. C., and Laurence H. Whitlow, of New Orleans, La., on the brief), for petitioner.

Charles W. Racine, of Toledo, Ohio (Charles W. Racine, of Toledo, Ohio, Emmett V. Spitler, of Bowling Green, Ohio, and Williams, Eversman & Morgan, of Toledo, Ohio, on the brief), for respondent.

Before HICKS, SIMONS, and McALLISTER, Circuit Judges.

HICKS, Circuit Judge.

Petition to enforce an order of the National Labor Relations Board. Jurisdiction is admitted.

The Board ordered respondent to cease and desist: from discouraging membership in, or refusing to bargain collectively with, International Union, United Automobile, Aircraft & Agricultural Implement Workers of America, affiliated with the C. I. O., (herein called the Union); or from interfering with, restraining or coercing its employees in the exercise of their rights guaranteed in Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157. Affirmatively, it was ordered to reinstate Henry Clabaugh to his former or equivalent position and make him whole for loss of pay by reason of its discrimination; upon request, to bargain collectively with the Union as the exclusive representative of its employees at its Bowling Green, Ohio, plant; to post notices, and to notify the Regional Director.

Respondent raises the questions:

(1) whether it received a fair and unprejudiced hearing guaranteed by the Fourteenth Amendment; and (2) whether the decision of the Board that respondent violated subsections 8(1), 8(3) and 8(5) of the N.L.R.A., 29 U.S.C.A. § 158 (1) (3) and (5), is supported by substantial evidence.

Respondent, an Ohio corporation, operated a plant at Bowling Green, Ohio, for the manufacture of precision parts, pilot gears, gunslides, etc., for the armed forces of the United States. It had five or six managerial and supervisory employees and ninety employees who, on July 27, 1942, were declared eligible by a Board representative to participate in an election. Organizational activities started on April 17, 1942, and Clabaugh, who had been employed only a few weeks, was made chairman of the Union's organizing committee. He was discharged eight days later. There appears upon his discharge or separation slip the following notation: "Late starting work, excessive smoking on job. To (sic) much talking and visiting at other machines. Do not rehire." This was signed by Dunlap, Secretary of respondent and an assistant to Grieder, its President. Thereafter Clabaugh and one or two others frequented the streets near respondent's plant and possibly its parking lot, and accosted employees and distributed handbills.

Touching the cause of his discharge, Clabaugh testified that on the morning of his dismissal he went to work at the usual time and found that the night operator of his machine had "torn the job down" and that after consulting with his foreman, Beck, he was ordered by Beck to reset it, which resulted in a delay of about forty-five minutes; that upon being questioned by Superintendent Strothers about the delay he explained it and this seemed to satisfy Strothers, but that in the afternoon after a conversation between Strothers and President Grieder, Strothers told him that he was being laid off because of the delay in getting started that morning; that he, Clabaugh, asked Strothers, "Is that the only reason or is it the Union?" Whereupon Strothers replied, "What do you think?"

At the hearing before the Board, respondent's witnesses advanced additional reasons for Clabaugh's discharge. They were, in substance, that his work was very poor and that he was guilty of causing excessive spoilage of material, or excessive "scrap." But the fact is, that respondent knew of Clabaugh's qualifications before it employed him, for he had undergone a preliminary training course in its plant, and the further fact is that there was no rule in the plant against smoking or talking among employees and that all employees had more or less "scrap" of which no record was kept. The Board concurred in the finding of the Intermediate Ex-

aminer that Clabaugh was discharged because of his Union membership and activity.

The Board also concurred in the finding of the Examiner that respondent had refused to bargain collectively with the Union as the representative of its employees. Crowley testified that after the Union was certified as bargaining agent he called on Grieder on October 31, 1942, and endeavored to present him with a contract prepared by the Union; that Grieder refused to accept it and stated that, "although we had won the election and had been certified, it didn't count any more because all the C. I. O. people were gone;" that after an extended argument Grieder still refused to accept the contract and said, "It is my plant and you haven't got a man working here any more;" that he further said, "I won't negotiate with you."

However, after the Union was certified as bargaining agent on August 18, 1942, four meetings were held between Crowley and Beemer, representing the Union, and Spitler, attorney for, and Dunlap, Secretary of respondent, for the purpose of negotiating a contract. Negotiations broke down on November 16, 1942, after respondent received a letter from the Regional Director advising it that an unaffiliated association had filed a petition raising a question as to representation. They were not resumed even though on November 17th the Regional Director rejected the petition of the unaffiliated association and the Union's certificate as representative for purposes of collective bargaining was never revoked. We do not go into detail touching the evidence as to what caused the break in negotiations on November 16th. It is enough to say that the Union's representatives insisted upon going forward and respondent's contention was that in view of the Regional Director's letter of November 16th it doubted the advisability of further recognizing the status of the Union as bargaining agent. Its sole effort to resolve this doubt is set forth as follows:

■ After the Regional Director had, on November 17th, rejected the petition of the unaffiliated association, Spitler asked its attorney, Lane, "Do I understand now that you are all through with that shop union proposition?" and Lane replied, "No, it's being appealed to Washington." The appeal of the association to the Board was dismissed on February 5, 1943, and re-

spondent was promptly notified thereof but did not recommence negotiations with the Union. It did not at any time communicate with the Regional Director touching the matter, as it had been invited to do in the letter of November 13, 1942. Conceding to respondent the utmost good faith, the best that may be said for it is that it committed an error of judgment. The attempted intervention of the unaffiliated association afforded no excuse to respondent for failing to resume negotiations thereafter. N.L.R.B. v. Botany Worsted Mills, 3 Cir., 133 F.2d 876, 881; Valley Mould & Iron Corp. v. N.L.R.B., 7 Cir., 116 F.2d 760, 765. Its duty was to continue negotiations and if it had any doubt as to its rights it might have resorted to the Board for clarification. This procedure was in fact suggested to it in the letter of the Regional Director of November 13th. Any other course would tend to hinder and nullify the wholesome provisions of the Wagner Act, 29 U.S.C.A. § 151 et seq. The law required a sincere effort by respondent to continue negotiations and it is not of great import that the Union failed to take the first step.

Respondent contends that the hearing before the Examiner was conducted in such a biased and unfair manner that it was denied a fair trial and that the action of the Board increased the effect of the Examiner's prejudice. Respondent charges in the brief, that "Every witness called by the respondent, according to the Examiner, was a liar, a cheat, and a crook, including the President of the Respondent Company, its Secretary and Assistant to the President, its plant Superintendent and its Attorney. * * * Not one of them is credited by the Examiner with telling the truth. In instance after instance, they are discredited by the Examiner, who preferred to accept the uncorroborated testimony of complainant Henry Clabaugh, who proved himself to be not only an incompetent workman, but a perjurer, as we have hereinafter demonstrated."

■ An inspection of the Intermediate Report reveals no characterization of any of respondent's witnesses as liars, cheats or crooks. It is of course true that if the Board had ignored all the evidence given by respondent and with studied design had given credence to the evidence of petitioner, its findings would have been arbitrary. N.L.R.B. v. Sartorius & Co., 2 Cir., 140 F.2d 203, 205. But we fail to

discover anything in the proceedings that would justify us in declaring them a nullity. In numerous instances where the facts were in dispute the Examiner credited the testimony of respondent's witnesses rather than petitioner's. We are not called upon to determine what we would have found if we had been the finders of facts. Our question is, whether the findings of the Board which adopted "the findings, conclusions and recommendations of the Trial Examiner" had substantial support in the evidence. Our power of review of the evidence is, as we have said many times, sharply limited. N.L.R.B. v. American Creosoting Co., Inc., 6 Cir., 139 F.2d 193; N. L. R. B. v. Sport-Wear Hosiery Mill, 6 Cir., 134 F.2d 824; N. L. R. B. v. Milan Shirt Mfg. Co., 6 Cir., 125 F.2d 376.

■ The Board might have drawn either of two inconsistent inferences from the record. See N. L. R. B. v. Nevada Cons. Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305. It is not left to us, where the testimony clashes (and that there were such clashes is evident), to say that the testimony of one side must be preferred to that of the other, or that the Board should have drawn the same inferences or found the same set of facts which we might, were we permitted to do so, have drawn or found Supported by authorities that may not be challenged, we have recently said, "that the power to draw inferences was entrusted to the Board and not to the courts." N. L. R. B. v. American Creosoting Co., supra [139 F.2d 195].

Respondent contends that the hearing before the Examiner was unfair, due to the bias and prejudice of the Examiner himself. In support of this contention it asserts that there was a variance between evidence and the allegations of the complaint in at least two particulars, (1) that Beck, one of the group of supervisory employees was found to have engaged in coercion, although no charge of any kind was made against him in the complaint; (2) that the Examiner allowed testimony of Nye, who quoted Grieder, the President, as referring to the C. I. O. as "a bunch of drunken bums," even though there was no charge in the complaint that respondent's management had spoken improperly of the Union.

■ This contention is unsound for two reasons, first, we have heretofore pointed out that the Examiner had broad authority to take evidence and make findings unfettered by the strict rules of judicial inquiry. Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38, 44; N. L. R. B. v. American Creosoting Co., supra, 139 F.2d at page 195. As to the question of variance, if any really existed, which we need not determine, we think respondent is foreclosed by National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 350, 58 S.Ct. 904, 82 L.Ed. 1381. Second, when we study the entire record to determine whether the Examiner was guilty of unrelieved bias, it appears that he allowed respondent full opportunity to meet Nye's testimony and at the conclusion of the hearing he asked, "Does the respondent desire any more time to develop this case as to any phase of the complaint, as the complaint is amended?" To this inquiry counsel replied, "The respondent does not desire any further time. * * * We are willing to submit the case as it is now submitted."

On the general question of whether the Examiner was biased or acted in bad faith, it is well to point out that on one occasion he adjourned the hearing to a hospital at respondent's request to take the testimony of one of its witnesses and that he found that respondent did not violate the Act in discharging Rudolph, who was active in the Union. See N. L. R. B. v. Gallup American Coal Co., 10 Cir., 131 F.2d 665.

It is urged that the Examiner repeatedly attempted to discredit respondent's witnesses without justification. We have examined the incidents in the record which are referred to to support this contention, and are content to say that the point is without merit.

■ We conclude that the order of the Board is supported by substantial evidence and that no sufficient reason to set it aside appears in the record.

Let a decree of enforcement be entered.

SIMONS, Circuit Judge (dissenting in part).

I concur in the major conclusions reached by a majority of the court. I think, however, that the affirmative directive contained in the Board's order requiring the respondent to re-employ Henry Clabaugh should be eliminated from the order for which enforcement is granted. There is cumulative evidence that Clabaugh was a poor workman, wasted his time, and was a destructive influence in the plant,

and this quite apart from his union activity. It is true that Clabaugh himself challenged this evidence, but upon this record Clabaugh's evidence, insofar as it is unsupported by other witnesses or reasonable inferences, is not entitled to belief by reasonable men, and so does not rise to the dignity of substantial evidence.