## MOTOR VALVE & MANUFACTURING CO. v. NATIONAL LABOR RELATIONS BOARD et al.

### No. 9902.

Circuit Court of Appeals, Sixth Circuit.

May 14, 1945.

Glenford R. Miller, of Detroit, Mich. (Cook, Smith, Jacobs & Beake and Grant L. Cook, all of Detroit, Mich., on the brief), for petitioner.

Harold A. Cranefield, of Detroit, Mich. (Alvin J. Rockwell, Malcolm F. Halliday, Ida Klaus, and Platonia Kaldes, all of Washington, D. C., and Harold A. Cranefield, of Detroit, Mich., on the brief), for respondent.

Before HICKS, ALLEN and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

The petitioner seeks to set aside an order of the National Labor Relations Board. The Board, in its answer, prays for an enforcement of the order. No jurisdictional question arises. The facts are stipulated.

Petitioner, a Michigan corporation, is now and was at all times herein mentioned, engaged at Marine City, Michigan, in the manufacture and sale in interstate commerce of poppet valves for internal combustion engines. The International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (C.I.O.) is a labor organization within

---

248

the meaning of sub-section (5) of Section 2 of the National Labor Relations Act, 29 U.S.C.A. § 152(5), and admits employees of petitioner to membership therein. Pursuant to a decision and direction of election, issued by the respondent, herein called the Board, on August 12, 1943, an election was conducted among the employees of the petitioner, constituting an appropriate unit, to select a representative for the purpose of collective bargaining with petitioner. The election was held on September 10, 1943, and out of sixty-one employees eligible to vote, fifty-eight voted. Of the votes cast two were void, thirty-one were for the Union as their representative and twenty-five against. On October 6, 1943, the Board certified the Union as the representative of the employees of petitioner for collective bargaining.

Before the issuance of the Board's certificate, petitioner agreed, upon the request of the Union, to meet with the Union at petitioner's offices on October 12, 1943, at two o'clock P. M. for the purpose of bargaining with the Union as the representative of petitioner's employees. Petitioner's authorized representatives were present at the time and place agreed upon but no representative of the Union appeared and no notice had been given petitioner of their intention not to appear.

On October 13, 1943, Mr. Miller of the law firm of Cook, Smith, Jacobs & Beake, authorized by petitioner, wrote Mr. Young, a representative of the Union, and authorized to act for it in the matter of collective bargaining, as follows:

"We represent Motor Valve & Manufacturing Co. of Marine City, Michigan, and about two weeks ago the writer made an appointment with you on the telephone to meet at Marine City on October 12, 1943, at two o'clock P. M. to carry on negotiations with reference to a contract with your Union.

"Yesterday the writer went to Marine City and, when you did not appear for the meeting, Mr. James of Motor Valve & Manufacturing Company called your home and found you were out of the city. This is quite unfortunate as the writer is leaving the city tonight and will not return until around October 27th and it, therefore, is impossible to have a meeting with you until some time after his return.

"In our telephone conference you advised that you would submit a form of contract as a basis for negotiations at our meeting and we would suggest, in order to avoid any undue delay, that you mail such contract to the writer here at Detroit as soon as you have it ready. We can then examine it prior to our first meeting which will probably save time in our negotiations.

"We would also suggest that you advise us by letter of a tentative date for a meeting after October 27th and the writer, upon his return, will contact you and confirm such date or arrange for a definite date that is mutually satisfactory."

This letter was not answered.

Next in sequence was a conversation between Miller and Young late in October 1943, in which Miller reasserted petitioner's willingness to meet with the Union for collective bargaining and Young agreed to communicate with Miller within a few days and propose a time and place for the meeting.

There were no further communications between the parties until January 24, 1944, when Young wrote to Mr. James, petitioner's president, that the Union was ready to proceed with negotiations and inquiring what day during the week of January 30th to February 5th might be reserved for that purpose. On February 7th following, James wrote to Young and reviewed all former efforts between the parties to arrange a meeting, and concluded his letter with the following statement:

"Under the foregoing circumstances, we do not believe that we should meet with you to negotiate a contract. We take this position because we are advised by a number of employees in our plant that they are not satisfied with your representation of them. We definitely feel that a new election should be had before we enter into any negotiations for the purpose of determining whether or not your Union is now a proper representative of our employees.

"We are sending a copy of this letter to the National Labor Relations Board * * * so that it may be apprised of the situation which exists."

All subsequent negotiations were by correspondence, which it is unnecessary to recite, for it is stipulated that petitioner "has refused at all times since January 24, 1944, and now refuses, to bargain collectively with the representative of re-

spondent's employees in the unit above described."

On February 18, 1944, petitioner's attorneys wrote to the Regional War Labor Board, 7th Region (evidently the National Labor Relations Board) enclosing copies of the correspondence between Miller and Young, and stating that, under the circumstances, their client did not feel that it should be compelled to enter into negotiations with the Union as the representative of the Company's workers; that upon evidence brought to the Company's attention, it was fearful that the Union did not represent a majority of its employees; that it in fact represented only a small minority. It was suggested in the letter that the only fair thing to do would be to hold another election to which the Company would consent. A copy of this letter was sent to Young but no reply was received.

On March 23, 1944, a charge of unfair labor practices was filed by the Union with the Board, and on July 17th following, a complaint was issued by the Board against petitioner charging it with violations of Section 8, sub-sections (1) and (5), 29 U.S.C.A. § 158(1, 5), and of Section 2, sub-sections (6) and (7) of the Act.

Section 8, sub-section (5) declares it to be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees subject to the provisions of Section 9(a), 29 U.S.C.A. § 159(a).

On August 7, 1944, the petitioner answered the complaint, admitted that it had refused to bargain collectively with the Union as the representative of its employees after January 24, 1944, and based its refusal on two contentions,—first, that the Union had forfeited its status as bargaining agent by ignoring petitioner's efforts to bargain from October 6, 1943, the date of its certificate as bargaining agent, until January 24, 1944, or a period of a little more than three and a half months; and second, that during this interval a large number of petitioner's employees had left its service and many new employees had been hired, and petitioner was informed and believed that the Union did not represent a majority of the employees on January 24, 1944, or since, that its employees were dissatisfied with the Union as their representative, and that it, the petitioner, therefore desired to have a new consent election.

Upon the issues thus to be presented to the Board, the petitioner, the Union, and the Board entered into a stipulation covering an agreed statement of facts and the whole matter was submitted to the Board for decision.

On October 17, 1944, the Board decided that petitioner had engaged in unfair labor practices within the meaning of Section 8, sub-sections (1) and (5), and Section 2, sub-sections (6) and (7) of the Act. The usual cease and desist order followed, accompanied by an order directing petitioner to take certain affirmative action.

■ It is at once apparent, laying to one side the contentions of petitioner hereafter to be considered, that the findings and order of the Board are sustained by substantial evidence, for, as we have pointed out, petitioner stipulated that it had refused to bargain collectively with the Union as the representative of its employees after January 24, 1944. The Board found that the failure of the Union to negotiate during the period indicated did not justify petitioner's refusal to bargain. This holding was based upon the following cases: N. L. R. B. v. Grieder Mach., Tool & Dye Co., 6 Cir., 142 F.2d 163; National Labor Relations Board v. Appalachian Elec. Power Co., 4 Cir., 140 F.2d 217; National Labor Relations Board v. The Century Oxford Mfg. Corporation, 2 Cir., 140 F.2d 541; National Labor Relations Board v. Botany Worsted Mills, 3 Cir., 133 F.2d 876; Valley Mould & Iron Corp. v. National Labor Relations Board, 7 Cir., 116 F.2d 760.

We need not review these cases. It is apparent that the Union as bargaining agent was not required to negotiate with petitioner immediately after certification. Unless the spirit and purpose of collective bargaining is to be thwarted, the bargaining agent should be allowed time within which to prepare itself for its duties. This involves the collecting, assembling and digesting of the economic facts of the case to the end that the agent might intelligently present to the employer the claims and demands of the employees. The Board found in effect that three and a half months was not too long for that purpose and we cannot say that this finding was arbitrary or capricious. We think that the holding could have been reasonably arrived at.

■ The second contention of petitioner is equally untenable. Upon this point the

stipulated facts are: "On January 24, 1944, there were in respondent's employ 53 of the 61 employees employed in the bargaining unit at the time of the election of September 10, 1943, and 26 employees within the unit who had been employed after the said election. At the date of this stipulation 39 of the original 61 employees in the unit are in respondent's employ and 36 employees hired since September 10, 1943."

It thus affirmatively appears that on January 24, 1944, when the Union offered to negotiate with petitioner, it did represent not only a majority of petitioner's servants employed in the bargaining unit at the date of the election, but this was also true as late as August 24, 1944, when the matter was submitted to the Board. There was no substantial evidence before the Board that petitioner's employees or at least a majority of them ever became dissatisfied with the Union as the bargaining agent. There was therefore no justification for petitioner's refusal to bargain with the Union upon the ground that it did not represent a majority of employees in the unit. The facts are sufficient to sustain the decision of the Board in this respect.

The petition to set aside the order of the Board is denied and its enforcement is ordered.