NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

BALTIMORE PAINT AND CHEMICAL CORPORATION, Respondent.

No. 8580.

United States Court of Appeals Fourth Circuit.

Argued June 4, 1962.

Decided Sept. 7, 1962.

Melvin Pollack, Atty., N. L. R. B. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N. L. R. B., on brief), for petitioner.

Jacob Blum, Baltimore, Md. (Charles Yumkas, Baltimore, Md., on brief), for respondent.

Before SOPER, HAYNSWORTH and BELL, Circuit Judges.

## J. SPENCER BELL, Circuit Judge.

The Board seeks enforcement of its order that respondent, Baltimore Paint and Chemical Corporation, (1) cease and desist from interfering with and coercing its employees in the exercise of their right to engage in Union activity, and (2) reinstate one Arnold Knott, a former employee. The order was supported by findings that the Company violated Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1) by threatening Knott with discharge for Union activity and Sections 8(a) (1) and (3) by transferring Knott to an undesirable job and subsequently firing him for the same reason.

We are faced with two questions by the appeal (1) whether there is substantial evidence to support the Board's findings, and (2) whether the Trial Examiner and the Board improperly rejected certain evidence proffered by the Company. On this record the first question must be answered yes and the second, no.

The Company is engaged in manufacturing, warehousing, and selling paint. Arnold Knott was first employed by the Company as an "order filler" on November 27, 1956. It was conceded that he worked at this job for about a year and a half without particular difficulty or criticism. He was thereupon given a job as fork lift operator in buildings A, B and K, where he worked until transferred to building L. There was evidence that Knott's work was not entirely satisfactory to his immediate supervisor, Haller, who complained to his superiors that Knott talked too much to the other employees, thereby interrupting their work. Knott was thereafter reassigned to his former territory in buildings A, B and K.

On March 8, 1961, Knott joined the Warehouse Employees Union Local 570 and immediately commenced what appeared to be almost a one-man campaign to organize the Company. According to Knott himself, the first Union meeting attracted only 7 or 8 out of 185 employees, and thereafter only Knott and one other person attended. Knott received and distributed some 25 Union cards on non-working time. The Company had no rule prohibiting or regulating soliciting on Company time. The plant General Manager, Edward Levenson, testified that Knott's activity on behalf of the Union was generally known throughout the plant. During the latter part of March, Levenson called Knott to his office and asked him if he had been attending Union meetings. When Knott at first denied the charge Levenson became angry and cursed him, telling him that while he could not stop him from attending meetings, he did want him to stop talking Union around the shop. He concluded by saying that he could fire him for such activity and would, if he reported his reprimand to the Union Agent. Sometime later Rogers, another foreman, told Knott that if the Union failed to get in, he, Knott, was as good as out of a job.

Two weeks after the interview with Levenson Knott was transferred by Rogers from his job as a fork lift operator to the relabeling table, where his duty was to remove labels from cans with live steam applied with a hose. Rogers declined to give Knott any reason for the change. The explanation given at the hearing was that Knott could thereby be confined to an area which he could not leave without the knowledge of a supervisor. The obvious purpose of the change was to limit his contacts with other employees as well as to keep him under surveillance.

On the morning of May 10, 1961, Knott was given a rush job of removing

the labels from twenty cans of paint before 2:00 P.M. that day. As the job was beyond the capacity of one man, Supervisor Bailey sent another employee to help. Shortly after the lunch hour one of the foremen discovered Knott away from his job and apparently exiting from building F which, it was contended by the Company, had been placed off limits to Knott. He was summarily fired for leaving his job in spite of Knott's explanation that he had become thirsty, gone to the cafeteria for a drink, and on his return, stepped just inside the door of building F to glance at the clock.

In discharging Knott, Traffic Manager Marsh summarized the charges against him. They included the two occasions when he had been caught smoking in the bathroom during the past four years, the last of which had occurred more than a year prior to the discharge; and the fact that he was late to work that morning although he had been late before without drawing a formal complaint. It is difficult to believe that Knott's derelictions were of a serious nature when counsel for the employer attempts to make much of the fact that in four years he was twice caught smoking and loafing in the building F washroom, the last occasion being a whole year before his discharge. Further, these instances seem to have elicited no greater rebuke than the statement to Knott by a Supervisor Rogers "You are not supposed to use this bathroom". It was conceded that no written complaints were registered concerning these or any other of Knott's offenses against Company discipline until after Knott's Union activities began.

■■ Knott's derelictions, even if as numerous as contended by counsel for respondent in his brief, were not of such a serious nature as to call for formal complaints. It is too much of a coincidence that his reassignment to a disagreeable job and his subsequent discharge coincided so closely with his Union activity if these derelictions had, as contended, been steadily accumulating over the years. Especially is this true when no witness placed a complaint within six

months of the transfer and discharge unless, in fact, the rejected testimony would have done so. It was the function of the Trial Examiner in the first instance and of the Board to resolve the conflicting claims concerning the reasons for Knott's transfer and discharge. Upon this record there is substantial evidence to support the findings that Knott was discriminated against because of Union activity and that management was interfering with employee's rights to organize and bargain collectively. N. L. R. B. v. Jones Sausage Company, 257 F.2d 878 (4 Cir. 1958).

■■ We now turn to the testimony which was proffered through Marsh and rejected by the Trial Examiner on the grounds that it was too remote and merely cumulative. After a careful examination of this record we can find no support for respondent's contention. Counsel for the respondent himself stated to the Examiner that the testimony had "no bearing on the reason for his discharge". When given the opportunity to make his offer of proof for the record, counsel was not able to show any specific complaint against Knott not already proved, but apparently was merely trying to offer through Marsh evidence of the same incidents which had been previously or were subsequently testified to in detail by Rogers, Haller and Bailey, who were immediately over Knott and who had reported his alleged derelictions to Marsh. Again counsel for the respondent referred to the proffered testimony as "background". Since the proffered evidence did not propose to show any formal complaints against Knott—or any penalty in loss of routine increments to his pay— and since it had no direct bearing on his discharge and indeed appeared from counsel's statement to be confined to a period one and one-half years prior to discharge—contrary to what is now contended in respondent's brief—we cannot hold that the Trial Examiner abused his discretion in rejecting it as too remote and merely cumulative. The extent of examination and cross-examination of witnesses rests in the sound discretion of

the Trial Examiner. N. L. R. B. v. Bryan Mfg. Co., 196 F.2d 477 (7 Cir. 1952); N. L. R. B. v. Grieder Machine Tool & Die Co., 142 F.2d 163 (6 Cir. 1944), cert. den. 323 U.S. 724, 65 S.Ct. 56, 89 L.Ed. 582. Cf. N. L. R. B. v. Steel, etc. Fabricators Local 810, A. F. L.-C. I. O., 253 F.2d 832 (2 Cir. 1958).

 There is no contention and no basis for any contention that the evidence was of such importance that its exclusion amounted to lack of due process. The Examiner in conducting the hearing was bound by the rules of evidence applicable in the District Courts, 29 U.S.C.A. § 160 (b). We find no abuse of discretion.

The Order of the Board will be enforced.

Enforced.